Slip Op. 01-142

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

------------------------------------------------------ x

DEFENDERS OF WILDLIFE, *ET AL.*,            :

                    Plaintiffs,            :

                                         Court No. 00-02-00060

      v.            :

WILLIAM T. HOGARTH, *ET AL.*,            :

                    Defendants.            :

------------------------------------------------------ x

[Plaintiffs' Motion for Judgment pursuant to USCIT Rule 56.1 denied.]

                            Decided:  December 7, 2001

*Defenders of Wildlife (William J. Snape, III)*, for Plaintiffs.

*Robert D. McCallum,* Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Lucius B. Lau*); *Anthony P. Hoang,* Attorney, Environment and Natural Resources Division, General Litigation Section, United States Department of Justice; *Mark A. Brown* and *Wayne D. Hettenbach*, Attorneys, Environmental and Natural Resources Division, Wildlife and Marine Resources Section, United States Department of Justice; *Judson J. Feder*, Southwest Regional Counsel, NOAA, United States Department of Commerce, of Counsel; *Violanda Botet*, Attorney-Advisor, Office of Legal Advisor, United States Department of State, of Counsel; for Defendants.

## OPINION

**BARZILAY, JUDGE:**

### I.  INTRODUCTION

In this case, the court is asked to evaluate the latest actions taken by the government of the United States in its long effort to protect dolphins endangered as a result of certain tuna-fishing practices.  This government action began in 1972, with the passage of the United States

Marine Mammal Protection Act ("MMPA"), driven by intense interest in and activity on behalf of dolphins by U.S. individuals and environmental groups, some of whom find themselves on opposite sides of the question at bar in the current case.[1]

Defenders of Wildlife[2] challenge three administrative determinations made by Penelope D. Dalton, *et al*,[3] to implement the 1997 International Dolphin Conservation Program Act ("IDCPA"), which amended the MMPA. Specifically, Plaintiffs make three distinct claims: (1) that Commerce's *Interim-Final Rule* on the taking of allegedly depleted dolphins pursuant to fishing operations by tuna purse seine vessels in the Eastern Tropical Pacific ("ETP") ocean

---

[1]For a detailed history of the numerous U.S. statutory enactments and international efforts to protect dolphins, including the inevitable unintended and unforeseen consequences, and the backlashes and conflicts, see Richard W. Parker, *The Use and Abuse of Trade Leverage to Protect the Global Commons: What We Can Learn From the Tuna-Dolphin Conflict*, 12 GEO. INT'L ENVTL. L. REV. 1, 6 (1999). ("For nearly ten years, the tuna-dolphin issue has been identified with trade and environment conflict. Nearly lost in the legal conflict has been the story of the quiet emergence of one of the most innovative and effective environmental regimes in the world–a regime which has reduced dolphin mortality by over 99% while eliciting a very high level of compliance from all fishers and flag states in the fishery.")

[2]Plaintiffs in this cause are Defenders of Wildlife, Earth Island Institute, Humane Society of the United States, Environmental Solutions International, Animal Welfare Institute, International Wildlife Coalition, American Humane Association, Earthtrust, Greenpeace Foundation, Animal Fund, American Society for the Prevention of Cruelty to Animals, David Brower, Samuel Labudde, Craig Van Note, and the Sierra Club. The court refers to Plaintiffs collectively and interchangeably as "Defenders of Wildlife," "Defenders," and "Plaintiffs."

[3]By delegation, the Secretary of Commerce gave Penelope D. Dalton, in her official capacity as the Assistant Administrator for Fisheries for the National Marine Fisheries Service ("NMFS"), an organization of the National Oceanic and Atmospheric Administration ("NOAA") of the United States Department of Commerce ("Commerce"), the authority to render these findings. She subsequently was replaced by William T. Hogarth. The named Defendants in this case are William T. Hogarth, the Secretary of Commerce, the Under Secretary of Commerce, the Assistant Secretary of the NOAA, the Secretary of State, and the Secretary of the Treasury. Throughout the opinion the court refers to Defendants collectively.

violates the MMPA, (2) that the Environmental Assessment ("EA") prepared by Defendants

violates the National Environmental Policy Act ("NEPA") and applicable regulations, and that

Defendants should have completed an Environmental Impact Statement ("EIS") for the entire

new tuna/dolphin program, and (3) that the affirmative finding rendered by the United States

Department of Commerce ("Commerce"), which lifted the United States' tuna embargo against

Mexico, violates the IDCPA and NEPA.  Defenders seek a declaratory judgment, a remand to

Commerce with instructions to issue a revised proposed rule, and an order to Defendants to

complete an EIS on the new tuna/dolphin program.  Plaintiffs do not now seek a reinstatement of

the embargo, but reserve their right to do so.  Defendants oppose Plaintiffs' motion.  The court

exercises jurisdiction under 28 U.S.C. § 1581(i)(3) (1994).


## II.  BACKGROUND

The ETP is a seven million square mile stretch of ocean running from the coast of

southern California to Peru.  Yellowfin tuna swim beneath dolphins in these waters.  Because

dolphins surface for air and are hence more visible than tuna, fishermen in the ETP use dolphin

sightings as an aid to catch tuna.  One common method of fishing for tuna in the ETP involves

lowering a commercial fishing net, called a purse seine, into the water around a group of

dolphins.  Once the net encircles the dolphins, a drawstring around the bottom of the net is closed

to catch the yellowfin tuna below.  During this process dolphins may become entrapped in the

net.  While some dolphins are released alive, others suffocate by the time a release can be made.

Although certain safety devices in the nets and other changes in fishing practice have

significantly decreased the number of dolphin mortalities associated with the purse seine method,

some dolphin deaths continue to occur.

*A.        Background Legislation*

In the early 1970s, an estimated 350,000 dolphins were killed annually due to purse seine

fishing.  Congress passed the MMPA in 1972 in response to public concern over the ETP

yellowfin tuna fishing industry.  16 U.S.C. § 1361 (1972).  Congressional findings indicated that

> (1) certain species and population stocks of marine mammals are, or may be, in
> danger of extinction or depletion as a result of man's activities; [and that]
> . . .
>
> (6) marine mammals have proven themselves to be resources of great international
> significance, esthetic and recreational as well as economic, and it is the sense of
> the Congress that they should be protected and encouraged to develop to the
> greatest extent feasible commensurate with sound policies of resource
> management and that the primary objective of their management should be to
> maintain the health and stability of the marine ecosystem.

16 U.S.C. §1361(1), (6).  The MMPA centered on the principle of fisheries management to foster

a sustainable population.  The act primarily relied on a permit system to regulate fishing

practices.

In 1988, Congress enacted the Marine Mammal Protection Act Amendments of 1988,

Pub. L. No. 100-711, 102 Stat. 4755 (1988) ("1988 Amendments"), which specified criteria to be

satisfied for the regulatory program of a tuna-harvesting nation to be considered comparable to

that of the United States, and thus have access to the U.S. market.  Pub. L. No. 100-711 at § 4,

102 Stat. at 4765.   In 1990, Congress enacted the Dolphin Protection Consumer Information Act,

("DPCIA").  The DCPIA made it a violation of section 5 of the Federal Trade Commission Act

("FTCA") for any producer, importer, exporter, distributor, or seller of any tuna product sold in

or exported from the United States to label that product as "dolphin-safe" if the product contained

tuna harvested (a) on the high seas by a vessel engaging in driftnet fishing, or (b) in the ETP by a

vessel using the purse seine method, unless the tuna was accompanied by various statements

demonstrating that no dolphin was intentionally encircled during the trip in which the tuna was

caught.

Pursuant to the 1988 Amendments, in August of 1990, the United States imposed an

embargo on Mexico for failure to achieve comparability with U.S. tuna harvesting standards.

H.R. Rep. No. 105-74(I), at 13 (1997), *reprinted in* 1997 U.S.C.C.A.N. 1628, 1631.  Mexico then

requested the establishment of a dispute settlement panel in accordance with the General

Agreement on Tariffs and Trade ("GATT").  The panel concluded that the U.S. tuna embargoes

violated GATT.  However, the panel's decision was not adopted by the GATT Council, and was

not pursued further by Mexico in the World Trade Organization ("WTO"),  GATT's successor.

In 1993, the European Union ("EU") brought a GATT challenge relating to the tuna embargo

provisions of the MMPA.  A GATT panel again ruled against the United States, but again the

GATT Council did not adopt the decision.

In June of 1992, the United States entered into the La Jolla Agreement, a non-binding

international agreement setting forth programs to protect dolphins from harm in the ETP, and

allowing the practice of purse seine fishing with dolphin mortality caps.  Six months later,

Congress enacted the International Dolphin Conservation Act of 1992 ("IDCA"), which amended

the MMPA by (a) imposing a five-year moratorium upon the harvesting of tuna with purse seine

nets; and (b) lifting  tuna embargos upon  those nations making a declared commitment to implement the moratorium and take further steps to reduce dolphin mortality.  1997 U.S.C.C.A.N. at 1632.  The La Jolla Agreement led to the signing of the Panama Declaration, under which the United States and eleven other nations  made affirmative commitments to strengthen the protection of dolphins by (a) reducing dolphin mortality to levels approaching zero, with the goal of eliminating dolphin mortality in the ETP; (b) establishing annual dolphin mortality limits ("DMLs"); (c) avoiding bycatch of immature yellowfin tuna and other non-target species such as sea turtles; (d) strengthening national scientific advisory committees; (e) creating incentives for vessel captains; and (f) enhancing the compliance of participating nations to these commitments.  The Panama Declaration also sought to negotiate a new binding agreement to establish the International Dolphin Conservation Program ("IDCP"), contingent upon the United States amending its laws to (a) lift the embargoes imposed under the MMPA; (b) permit the sale of both dolphin-safe and non-dolphin safe tuna in the United States market; and (c) change the definition of "dolphin-safe tuna" to mean "tuna harvested without dolphin mortality," rather than tuna harvested without any dolphin encirclement. *Panama Declaration* at Annex I.

In 1997, Congress enacted the International Dolphin Conservation Program Act ("IDCPA"), which is the subject of this litigation.  Pub. L. No. 105-42, 111 Stat. 1122 (1997). The act stated three purposes: (a) to give effect to the Panama Declaration; (b) "to recognize that nations fishing for tuna in the [ETP] have achieved significant reductions in dolphin mortality;" and (c) "to eliminate the ban on imports of tuna from those nations that are in compliance with the [IDCP]."  *See id.* at § 2, 111 Stat. at 1122.  The IDCPA amended the MMPA yet again and

revised the criteria for banning imports. A nation would be permitted to export tuna to the

United States if it provided documentary evidence that (a) it participates in the IDCP and is a

member of the Inter-American Tropical Tuna Commission ("IATTC"); (b) it meets its

obligations under the IDCP and the IATTC; and (c) it does not exceed certain DMLs. *See id.* at §

4, 111 Stat. at 1123-1124 (16 U.S.C. §1371(a)(2)(B)). Furthermore, the IDCPA changed the

"dolphin-safe" labeling standard by amending the DPCIA. Pursuant to this amendment, the

Secretary of Commerce was directed to make initial and final findings of "whether the intentional

deployment on or encirclement of dolphin with purse seine nets is having a significant adverse

impact on any depleted dolphin stock in the eastern tropical Pacific Ocean." 16 U.S.C.

§1385(g)(2). These findings would in turn be used to determine whether to revise the definition

of "dolphin-safe" tuna. *See* 16 U.S.C. § 1385(d). The IDCPA provided that it would become

effective when the Secretary of State certified that a legally-binding instrument establishing the

IDCP had been adopted and was put into force. *See* PL 105-42 at § 8, 111 Stat. at 1139.[4]

---

[4]This provision, basing the effective date of the statute on the completion of a legally binding international agreement, is not the only noteworthy feature of the legislation. It amends the existing dolphin protective scheme for the specific purpose of supporting international efforts to protect dolphins and other species. *See* 111 Stat. at 1112 § 2. It empowers the Secretaries of State and Commerce to "seek to secure a binding international agreement to establish an International Dolphin Conservation Program...." 111 Stat. at 1129, Sec. 6, § 302. Although the language is specific with regard to some of the required features of such a program, it clearly contemplates that the parameters of the program await future negotiation and completion. For that reason, the language of the various provisions refer continually to the International Dolphin Conservation Program and its requirements in several contexts, including the documentation required for a nation's commercial fishing product to be imported in the United States. 111 Stat. at 1123, § 4(b)(1)(B)(iii). Other references to the international program appear in sections dealing with such topics as the setting of dolphin mortality limits, 111 Stat. at 1129, Sec. 6, § 302, what specialized fishing equipment may be required, 111 Stat. at 1129, Sec. 6, § 303(a)(2)(B)(iv), and the requirement to consult with the international governing body if the United States needs to take steps to reduce unusual incidental mortality or serious injury to

The IDCPA and the subsequent international agreement represented a change in policy on the part of the United States. Congress clearly endorsed the idea that a new approach was needed. It understood that the embargo had limited leverage on the international community. As Sen. Chafee pointed out, "the ETP is completely outside the jurisdiction of the United States. We cannot simply go in and tell others how to fish. Instead our best chance of promoting conservation is through a multilateral, rather than unilateral, forum." 143 Cong. Rec. S8294-02, 8304 (1997). Congress, however, was not abandoning its efforts to preserve the ecosystem. The safer procedures of seine-net fishing gaining acceptance among those fishing in the ETP, and embodied in the Panama Declaration, pointed to a more effective regime. That regime directly contributed to the reduction in dolphin mortality witnessed in the past decade. It also had the benefit of protecting the entire ecosystem, and not just one species. As the House Committee Report noted, alternative methods imperiled species other than dolphins, including sharks, billfish, sea turtles, and a great number of immature tuna. H.R. Rep. 105-74(I), at 37.

With the IDCPA Congress endorsed, and charged the Executive Branch with executing, a simple trade-off. The U.S. would lift the existing embargo if other nations agreed to bind their vessels to the new, more protective practices. In addition, the crucial compromise struck during Senate consideration of the bill provided a fail-safe. While the embargo could be lifted

---

dolphins. 111 Stat. at 1131, Sec. 6, § 303(2)(C)(c). Overall, the act attempts to balance the goals of opening the United States' market to the international fishing industry in exchange for its adopting more protective fishing practices and closely monitoring the results of this liberalization by requiring scientific research into the health of dolphin populations. However, even during the important monitoring process, the act requires consultation with the international governing body when the Secretary of Commerce undertakes the scientific research necessary to trigger the change in the meaning of the dolphin-safe tuna label. 111 Stat. at 1133, Sec. 6, § 304. *See also* § B of the opinion.

immediately, the "dolphin-safe" label would remain in place pending a scientific review by the

Department of Commerce.  That review is now the subject of litigation in the Northern District

of California.  *See Brower v. Daley,* 93 F. Supp. 2d. 1071 (N.D. Cal. 2000) *aff'd* 257 F.3d 1058

(9th Cir. 2001).  Following enactment of the IDCPA, in May of 1998, the eight nations that signed

the Panama Declaration signed the Agreement on the International Dolphin Conservation

Program ("International Agreement").  The International Agreement became effective on

February 15, 1999, after four nations (United States, Panama, Equador, and Mexico) deposited

their instruments of "ratification, acceptance, or adherence with the depository for the

agreement." Art XXVII; *see also IDCPA* at § 8, 111 Stat. at 1139.

*B. The Initial Finding, the Proposed Rule, and the Interim-Final Rule.*

In May of 1999, Commerce, acting through the NMFS and the NOAA, published its

initial finding pursuant to the IDCPA. *See Taking of Marine Mammals Incident to Commercial*

*Fishing Operations; Tuna Purse Seine Vessels in the Eastern Tropical Pacific Ocean (ETP);*

*Initial Finding*, 64 Fed. Reg. 24590, 24591 (May 7, 1999) ("*Initial Finding*").   In the *Initial*

*Finding*, Commerce allowed for the change in the meaning of the tuna label when it determined

that no sufficient evidence existed to conclude that intentional encirclement of dolphins with

purse seine nets was having an adverse effect on depleted dolphin stock in the ETP.  The *Initial*

*Finding* was challenged in the Northern District of California.  *See Brower v. Evans*, 257 F.3d at

1060.  The district court granted  the plaintiffs' motion for summary judgment, holding that the

Secretary abused his discretion when he triggered a change in the dolphin-safe label standard on

the ground that he lacked sufficient evidence of significant adverse impacts.[5] *See Brower v.*

*Daley,* 93 F. Supp. 2d. at 1089.

On June 14, 1999, Commerce published a proposed rule to implement the IDCPA.

*Taking of Marine Mammals Incidental to Commercial Fishing Operations; Tuna Purse Seine*

*Vessels in the Eastern Tropical Pacific Ocean (ETP)*, 64 Fed. Reg. 31806 (June 1999)

("*Proposed Rule*"). Commerce accepted public comments on the *Proposed Rule* through July

14, 1999. Several plaintiff organizations submitted written comments on the *Proposed Rule* and

testified at the public hearings. Commerce then published its interim-final rule. *Taking of*

*Marine Mammals Incidental to Commercial Fishing Operations; Tuna Purse Seine Vessels in*

*the Eastern Tropical Pacific Ocean (ETP)*, 65 Fed. Reg. 30 (Jan 3, 2000) ("*Interim-Final Rule*").

On April 12, 2000, Commerce found that the Government of Mexico met the

requirements of MMPA section 101(a)(2)(B) and (C) to import yellowfin tuna harvested in the

ETP by purse seine vessels into the United States. Notice of this finding was published in the

Federal Register on May 8, 2000. *Taking and Importing of Marine Mammals,* 65 Fed. Reg.

26585 (May 8, 2000).

### C.    *Procedural History of this Litigation*

On February 8, 2000, Plaintiffs filed their original complaint with the court. Upon

---

[5]The trial court judge noted the extremely specific terms of the statute requiring research into the stress impact on dolphins of purse seine net fishing, the lack of any preliminary data from such projects, and concluded, "the Secretary acted contrary to the law and abused his discretion when he triggered a change in the dolphin safe label standard on the ground that he lacked sufficient evidence of significant adverse impacts." 93 F. Supp. 2d. at 1089.

learning of the pending lifting of the embargo on Mexican tuna, Plaintiffs filed an amended complaint along with a motion for a preliminary injunction, seeking to maintain the embargo on Mexican tuna. On April 12, 2000, the court held an evidentiary hearing on the motion for a preliminary injunction. That same day, the United States Customs Service ("Customs") was instructed to lift the embargo against Mexican yellowfin tuna and tuna products. On April 14, 2000, the court denied Plaintiffs' motion, and Plaintiffs did not appeal that decision. 24 CIT ___, 97 F. Supp. 2d 1197 (2000).

Plaintiffs now request declaratory relief and a remand to Commerce, but do not renew their request for a continuation of the embargo. For the following reasons, the court denies Plaintiffs' motion.

### III.  STANDARD OF REVIEW

The scope and standard of review for the Court of International Trade is defined by 28 U.S.C. § 2640 (1994). Section 2640(e) provides, "[i]n any civil action not specified in this section, the [court] shall review the matter as provided in [5 U.S.C. § 706]." It is undisputed that this action was properly brought within the court's jurisdiction under 28 U.S.C. § 1581(i) (1994). As section 2640 does not specify the standard of review for civil actions filed under 28 U.S.C. §1581(i), the court reviews Plaintiffs' motion under 5 U.S.C. § 706 (1994). The court must "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). The scope of review is limited to the administrative record. *See* 28 U.S.C. § 2640(e); 5 U.S.C. § 706; USCIT R. 56.1.

It is well-settled that the arbitrary and capricious standard of review is not merely deferential to agency action, but the *most* deferential of the APA standards of review.  *See* In re *Gartside*, 203 F. 3d 1305, 1312 (Fed. Cir. 2000) ("Because this [arbitrary and capricious] standard is generally considered to be the most deferential of the APA standards of review, . . . the reviewing court analyzes only whether a rational connection exists between the agency's fact findings and its ultimate action") (citations omitted). "Such deference [to the administering agency] is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 866 (1984) and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991).  An agency action will be found to be arbitrary and capricious if

> the agency has relied upon factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n v. State Farm Mutual Auto. Ins*., 463 U.S. 29, 43 (1983)(citations omitted).  The court will uphold an administrative action if the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Electric v. N.R.D.C.*, 462 U.S. 87, 105 (1983).

To determine whether Commerce has acted in accordance with law in reviewing regulations adopted by an agency within the purview of its legislative delegation and mandate,

the court must undertake the two step analysis prescribed by *Chevron.* ("Regulations

promulgated pursuant to rulemaking authority granted to administrative agencies are analyzed

under the two-step procedure established in the Supreme Court's *Chevron* decision. . . ." *Haggar*

*Apparel Co. v. United States*, 222 F.3d 1337, 1340 (Fed. Cir. 2000)).[6]

First the court must determine whether the statute speaks to the precise question at issue.

*See Chevron,* 467 U.S. at 842. The expressed will or intent of Congress on a specific issue is

dispositive. *See Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 233-

237 (1986). Second, if the court determines that the statute is silent or ambiguous, the question

to be asked is whether the agency's construction of the statute is permissible. *See Chevron,* 467

U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation.

*See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). "[W]e need not

bv conclude that the agency construction was the only one it permissibly could have adopted to

uphold the construction, or even the reading the court would have reached if the question initially

had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11(citations omitted). Rather,

the court's "inquiry is confined to the question of whether the agency's interpretation of the

statute is 'inconsistent with [the] statutory mandate or ... frustrate[s] the congressional policy

underlying a statute'" *Haggar*, 222 F.3d at 1340-41 (quoting *Bureau of Alcohol, Tobacco &*

*Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 97 (1983)). Applying these

standards, the court holds that Commerce's *Interim-Final Rule* is not arbitrary, capricious, or not

---

[6] The Interim Final Rule is a set of regulations to implement the IDCPA. Included within these regulations are standards by which the Secretary of Commerce is authorized to lift the yellowfin tuna embargo, alter the dolphin-safe labeling standard and establish an enforcement regime. *See* 65 Fed. Reg. 30.

in accordance with law.


## IV.  DISCUSSION

*A.      The Interim-Final Rule is in Accordance with Law.*

Plaintiffs contend that the *Interim-Final Rule* violates the MMPA, as amended, and is therefore not in accordance with law.  First, Defenders claim that Commerce ignored the plain language of the IDCPA by permitting sundown sets upon dolphins upon completion of the backdown procedure  a half-hour *after* sundown, instead of *before* sundown, as stated in the IDCPA.  Second, Plaintiffs assert that the *Interim-Final Rule's* triggers for imposition of embargoes upon exporting nations are unauthorized and contrary to the statutory language of the IDCPA.  Third, according to Defenders, the tracking and verification programs detailed in the *Interim-Final Rule* are defective.  Finally, Plaintiffs assert that, contrary to Congressional direction given in the IDCPA, Defendants have refused to implement positive incentives toward reducing dolphin mortality, and have even instituted incentives to maintain dolphin mortality at a certain level.

1.      The *Interim-Final Rule's* provision on sundown sets is not illegal.

The *Interim-Final Rule* provides that "[o]n every set encircling dolphin, the backdown procedure must be completed no later than one-half hour *after* sundown. . . ."  50 C.F.R. § 216.24 (c)(6)(iii) (emphasis added).  The language of the IDCPA provides, however, that Commerce's regulations must include provisions "ensuring that the backdown procedure during sets of purse seine net on marine mammals is completed and rolling of the net to sack up has begun no later than 30 minutes *before* sundown..."  16 U.S.C. § 1413 (a)(2)(B)(v) (emphasis added).  Defenders

claim that the regulation's provision on sundown sets is not in accordance with law, because it is contrary to the express language of the enabling statute. If these were the only two examples of the use of such language, Defenders would have a strong argument. However, that is not the case, and Defenders' argument fails. This case is unique for several reasons. First, the IDCPA is a culmination of a quarter-century of legislative and administrative action, not legislation written on a blank slate. Second, the relationship between the implementing act and the International Agreement inverts the traditional chronological order. Most international agreements receive congressional approval and implementing authority *after* they have been negotiated. The IDCPA gave *standing authority* to the executive branch to negotiate an international agreement and to issue regulations to implement the agreement, *without returning to Congress* for authorization. Therefore, the court does not analyze this language as merely a conflict between a word in the regulations and a word in the statute. It must look to the various statutory revisions, legislative histories, international agreements, diplomatic declarations and the historical practices of the fishing industry in the ETP.

Before granting *Chevron* deference to an agency regulation, the court must carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable.

> [T]o ascertain whether Congress had an intention on the precise question at issue, we employ the "traditional tools of statutory construction." The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter.

*Timex V.I., Inc. v. United States,* 157 F.3d 879, 882 (Fed. Cir. 1998) (citations omitted).

Congressional intent is paramount; therefore, a court may disregard obvious mistakes,

interpreting the statute so as to correct such mistakes. *See Bohac v. Dep't of Agriculture*, 239 F. 3d 1334, 1337 (Fed. Cir. 2001). As the D.C. Circuit stated, "[i]t is obvious, but bears repeating, that in legislative (as in judicial) affairs, allowance must be made for human error and inadvertence." *Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844, 871-72 (D.C. Cir. 1979). The law permits courts to correct these mistakes when the "overwhelming evidence" points in one direction and the final language of the act points in another. *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc*. 508 U.S. 439, 462 (1993). In such instances the express statutory language standing alone, "shocks common sense." *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930).

The need for overwhelming evidence is particularly acute in this case. The text without the proposed correction is not confusing on its face. *See e.g. U.S. v. American Trucking Assns*. 310 U.S. 534, 544 (1940). Nor is there a long history of administrative action assuming the mistake. *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 171 (1989). The change from "after" to "before" maintains the language's clarity, and Defenders are challenging the first administrative action under the Act. Despite these obstacles the government has met the burden in this case.

Although the language of the regulation does appear to conflict with the express statutory language regarding sundown sets, it does not conflict with the intent of Congress. When the language is placed in the context of twenty-five years of legislative enactments and enforcement congressional intent is clear. In many cases courts look to the traditional sources of legislative history for clarification and support. *Griffin v. Oceanic Contractors Inc*., 458 U.S. 564, 571 (1982). In this case the court has even more than traditional legislative history to discern

legislative intent.  Prior legislation that is part of the same legislative scheme to protect dolphins, legislative history, practical considerations and the International Agreement indicate that Congress intended to use the word "after," rather than "before,"  to establish the cut-off period for sundown sets.   Prior to the enactment of the 1988 Amendments to the MMPA, the Committee on Merchant Marine and Fisheries stated that "the back-down procedures would be completed and the net would be close to the seine vessel by 30 minutes *after* sundown. . . ."  H.R. Rep. No. 100-970, at 31 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6154, 6172 (emphasis added).  In the text of the 1988 Amendments, Congress directed Commerce to "prescribe regulations to ensure that the backdown procedure during sets of the purse seine net on marine mammals is completed and rolling of the net to sack up has begun no later than thirty minutes *after* sundown." Pub. L. No. 100-711, § 4, 102 Stat. 4755, 4767 (1988) (emphasis added).  Additionally,  as Commerce notes, Annex VIII to the Agreement on the IDCP provides that a tuna boat operating in the Agreement Area must "[c]omplete backdown no later than thirty minutes *after* sunset."  Annex VIII.3.e (emphasis added).   Even the *Proposed Rule* states that "[s]ince the purpose of the May 1998 Agreement on the IDCP is to implement the IDCP, NMFS proposes that requiring the backdown procedure to be completed no later than one-half hour after sundown best represents the language of the May 1998 Agreement on the IDCP and the spirit of the IDCP."  64 Fed. Reg. at 31810.

Employing a 30 minutes after sundown standard also makes more sense when applied in practice.  As Amici pointed out, in order to determine what time 30 minutes before sundown is when at sea, a ship would have to know its exact location and then calculate when the sun drops below the horizon.  It makes much more sense to determine the cut-off time based on an easily observable phenomenon like sundown itself.  *Oral Arg. Tr.* at 85 (October 31, 2001).

Defenders do not convince the court that Congress' use of the word "before" is a true expression of Congress' intent; therefore, the Interim-Final Rule is not contrary to law. In refuting Commerce's defense, Plaintiffs state that Commerce's argument of mistake "ignores the uncontroverted evidence in the record that sundown sets are extremely injurious and dangerous to dolphins,... and that the final legislative language in the Senate was laden with various hard-fought compromises." *Pls.' Br.* at 13. Unfortunately, Plaintiffs cannot point to any specific language in explaining that the clearly-expressed intent to end such sets after sundown in past legislation changed prior to the enactment of the most recent legislative amendment.[7] The *Interim-Final Rule's* provision directing that backdown procedures be completed 30 minutes after sundown does not conflict with express Congressional intent. Therefore, the court holds that the *Interim-Final Rule's* provision on sundown sets is in accordance with law.

2.    The *Final Rule's* Embargo Triggers are Not Contrary to Law.

The MMPA, as amended by the IDCPA, provides that the "Secretary of the Treasury shall ban the importation of commercial fish or products from fish... which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a). The MMPA further requires the government of the exporting nation to provide documentary evidence of comparability with United States standards. *See id.* Defenders claim

---

[7]Plaintiffs proffer the declaration of Senator Barbara Boxer of California, which states, "[a]mong the compromises I secured was legislative language pertaining to when sundown sets must be completed. 16 U.S.C. §1413(a)(2)(B)(v). Sundown sets are known to be particularly injurious to dolphins." *Decl. of Barbara Boxer* at ¶ 4. This general statement is not inconsistent with, let alone sufficient to overcome past language, even if the court were permitted to look outside the administrative record for guidance. In any event as this action is brought under USCIT R. 56.1 which provides for judgment on an agency record, Defendant's motion to strike the Declarations of Barbara Boxer and David Phillips on this issue is hereby granted.

that the *Interim-Final Rule* warps the strict embargo triggers established by the IDCPA. The

court does not agree.

### a.      Extraordinary Circumstances

The *Interim-Final Rule* provides that if the exporting nation's purse seine fleet exceeds

the total dolphin mortality limits or per-stock-per-year limits assigned by the IDCP, that

harvesting nation will still be eligible for an affirmative finding if

> (i) Because of extraordinary circumstances beyond the control of the nation and
> the vessel captains, the per-stock per-year dolphin mortality of the nations' purse
> seine fleet. . . exceeded the aggregated total of the per-stock-per-year limits
> assigned by the IDCP for that nation's purse seine vessels; and

> (ii) Immediately after the national authorities discovered the aggregated per-stock
> mortality limits of its fleet had been exceeded, the nation required all its vessels to
> cease fishing for tuna in association with the stocks whose limits had been
> exceeded, for the remainder of the calendar year.

65 Fed. Reg. at 55.   Defenders claim that this exception is unauthorized by Congress' strict

language regarding embargoes on exporting nations fishing for tuna in the ETP.

Defenders argue that Congress did not contemplate that a nation exceeding its DMLs

assigned by the IDCP would still be eligible for an affirmative finding; therefore the

"extraordinary circumstances" provision in the *Interim-Final Rule* is contrary to Congressional

intent and contrary to law.  The court agrees with Defenders' argument that an administrative

agency is not free to ignore the plain meaning of a statute and substitute its policy judgment for

that of Congress.  *See Pls.' Br*. at 15.  But here, there is no language referring to extraordinary

circumstances in the statute itself, and by providing for an extraordinary circumstances exception

Commerce has not contravened Congress' clear broad mandate within the legislative language to

implement the International Agreement.

In examining prior legislation and legislative history, the court notes that while the IDCPA does not contain a provision on extraordinary circumstances, the International Agreement on the IDCP does state: "[i]n cases involving unusual or extraordinary circumstances not foreseen in this Annex, the Parties. . . may take such measures as are necessary, consistent with the provisions of this Annex, in order to implement the DML system." Annex IV. IV.2. The IDCPA notes Congress' intent that the import ban should not apply, if exporting nations comply with the standards for fishing for yellowfin tuna as memorialized in the IDCP. *See* H.R. Rep. No. 105-74 (II), at 4, 1997 U.S.C.C.A.N. at 1659-60. The IDCPA further authorized Commerce to "issue regulations, and revise those regulations as may be appropriate, to implement the International Dolphin Conservation Program." 16 U.S.C. § 1413(a)(1).

Defenders have not shown that the "extraordinary circumstances" language ignores the plain meaning of the statute or runs contrary to Congressional policy. The presence of an extraordinary circumstances provision in the International Agreement on the IDCP, combined with the statute's language that embargos should be lifted from nations complying with the standards for ETP fishing as contained within the IDCP (16 U.S.C. § 1371(a)(2)(B)), and Congress' delegation to Commerce of rulemaking power to implement the IDCP, all indicate to the court that Commerce's extraordinary circumstances provision in the *Interim-Final Rule* is a reasonable interpretation of Congressional intent and thus in accordance with law.

### b. Per-Stock Per-Year DMLs

The IDCPA provides that the import ban will not apply to yellowfin tuna harvested with purse seine nets in the ETP if the exporting nation provides documentary evidence that

iii) the total dolphin mortality limits, and per-stock per-year dolphin mortality

limits permitted for that nation's vessels under the International Dolphin Conservation Program do not exceed the limits determined for 1997, or for any year thereafter, consistent with the objective of progressively reducing dolphin mortality to a level approaching zero through the setting of annual limits and the goal of eliminating dolphin mortality, and requirements of the International Dolphin Conservation Program.

16 U.S.C. § 1371(a)(2)(B)(iii).  Defenders argue that the *Interim-Final Rule* provision on per-stock per-year DMLs evidences Commerce's attempt to illegally change the per-stock per-year DMLs.  Again, the court holds that this provision is in accordance with law.

The *Interim-Final Rule* provides that in order for the Assistant Administrator of NMFS to make an affirmative finding permitting the importation of yellowfin tuna from the ETP,  four conditions must be satisfied.  First, the harvesting nation must participate in the IDCP and be either a member of the Inter-American Tropical Tuna Commission ("IATTC") or have initiated (and within 6 months completed) all steps required of applicant nations to become a member.  Second, the nation must meet  its obligations under the IDCP and its obligations of membership in the IATTC.  Third, the annual total dolphin mortality of the nation's purse seine fleet must not exceed the aggregated total of the mortality limits assigned by the IDCP.  Finally, the nation must respond to notification from the IATTC that an individual stock quota had been reached by prohibiting any additional sets on the stock for which the quota had been reached, or

If a per-stock per-year quota is allocated to each nation, the annual per-stock per-year dolphin mortality of the nation's purse seine fleet (including certified charter vessels operating under its jurisdiction) did not exceed the aggregated total of the per-stock per-year limits assigned by the IDCP for that nation's purse seine vessels (if any) for the year preceding the year in which the finding would start. . . .

50 C.F.R. 216.24(f)(9)(ii)(D)(2).  Plaintiffs claim that with this provision, Commerce has violated the IDCPA in two ways.  First, Commerce has attempted "to make the stock DML

mandate somehow optional for foreign tuna exporters." *Pls.' Br.* at 16.  Defenders assert that because the IDCPA supports only mandatory per-stock per-year foreign nation DML examinations by the NMFS, the provision is contrary to law.  Second, Defenders claim that the regulation only references "a global allocation system for per-stock per-year individual stock quotas," while the IDCPA requires national per-stock per-year DMLs.

Plaintiffs' assertions that the agency regulations are arbitrary and capricious cannot withstand scrutiny.  The text of the IDCPA does not explicitly indicate that mandatory per-stock per-year foreign nation DML examinations are to be required; nor does the IDCPA specifically direct the Secretary of State to negotiate agreements with foreign nations including a national allocation system for the per-stock per-year quotas, as opposed to a global allocation system. Therefore, the court will examine whether the regulations contravene Congressional intent, deferring to the agency's permissible construction of the statute.

Clearly, Congress' intent behind the per-stock per-year provisions of the IDCPA was to progressively reduce dolphin mortality.  The legislative history of the IDCPA specifically indicates that "[t]otal dolphin mortality under the International Dolphin Conservation Program [should] not exceed 5,000 in 1997, or any year thereafter...." H.R. Rep. No. 105-74 (II), at 4, 1997 U.S.C.C.A.N. at 1661.  Additionally, the International Agreement noted the signing Parties' collective intent to "[l]imit total incidental dolphin mortality in the purse-seine tuna fishery in the Agreement Area to no more than five thousand annually...." Art V.1; AR VII-97.  The Parties also agreed to "[e]stablish per-stock per-year dolphin mortality caps, and review and assess the effects of these caps. . . ." *Id.* at Article V.2.  In neither the text of the statute nor the legislative history does the IDCPA demand that a national, as opposed to global, allocation system for the

per-stock per-year quotas be established for an affirmative finding.[8]

In promulgating the *Interim-Final Rule*, Commerce reasonably and properly implemented the goals stated in the statute, legislative history, and related International Agreement. Section 216.24(f)(9)(i)(D)(1) provides that harvesting nations must respond to an IATTC notification that a stock quota has been reached by prohibiting additional sets on the stock for which the quota has been reached, and section 216.24(f)(9)(i)(D)(2) provides that for nations to which a per-stock per-year quota is allocated, the dolphin mortality of that nation's fleet may not exceed the limits assigned by the IDCP for that nation's vessels. These requirements in the regulations are completely consistent with specific statutory language and Congressional intent and further the stated goals of the legislation.

### c.   Total Annual DMLs

Defenders next challenge the third requirement established for an affirmative finding by the *Interim-Final Rule*, that, "[t]he annual total dolphin mortality of the nation's purse seine fleet (including certified charter vessels operating under its jurisdiction) [does] not exceed the aggregated total of the mortality limits assigned by the IDCP for that nation's purse seine vessels for the year preceding the year in which the finding would start. . . ."  50 C.F.R. § 216.24 (f)(9)(i)(C)(1).  Defenders assert that this regulation is illegal, in that it contravenes the explicit mandate of the IDCPA that annual DMLS "permitted for that nation's vessels under the International Dolphin Conservation Program do not exceed the limits determined for 1997, or for any year thereafter." 16 U.S.C. § 1371(a)(2)(B)(iii).

---

[8]The statute does contemplate that the international body may set national per stock per year limits. 111 Stat. 1124 § 4(1)(B)(iii).

The court agrees with Defendants that Defenders' brief contains no analysis supporting

their argument that this provision of the *Interim-Final Rule* violates the IDCPA, other than a

comparison of the language of the regulation with the statutory language. Indeed, "[t]he mere

fact that the regulatory language adopted by Commerce differs from the language contained in

the IDCPA does not establish that the regulation is contrary to law." *Defs.' Br.* at 34. Congress

has delegated to Commerce the authority to issue regulations to implement the IDCPA. Such

implementation could not occur if Commerce did not have the freedom to employ language other

than that used in the statute.

The court does not perceive how the regulation is unreasonable or contrary to Congress'

intent that dolphin mortality limits be reduced. Defenders' mere statement that although the

standard might be a useful guidepost for the government, it is not the standard adopted by

Congress, does not prove that Commerce's interpretation was arbitrary and capricious and not in

accordance with law. As earlier noted, Congress delegated to Commerce the authority to make

regulations to implement the IDCPA and make appropriate adjustments. The court will defer to

a regulation promulgated in exercise of that authority.

### d.    Five-Year Affirmative Findings

The *Interim-Final Rule* provides that once the Assistant Administrator makes and

publishes an affirmative finding,

> A finding will remain valid for 1 year or for other such period as the Assistant
> Administrator may determine. An affirmative finding will be terminated if the
> Assistant Administrator determines that the requirements of this paragraph are no
> longer being met. Every 5 years, the government of the harvesting nation, must
> submit such documentary evidence directly to the Assistant Administrator and
> request an affirmative finding. Documentary evidence needs to be submitted by
> the harvesting nation for the first affirmative finding subsequent to the effective

date of this rule.

50 C.F.R. § 216.24(f)(9)(i).  Defenders claim that in promulgating this regulation,

"Defendants have granted themselves unwarranted authority to institute a five-year lapse for

documentary evidence required from foreign nations for an affirmative finding by the Assistant

Administrator." *Pls.' Br.* at 17.  The court holds that this provision does not permit such a lapse

in the receipt of documentary evidence, and is in accordance with law.

In support of their argument, Defenders state that Congress intended that documentary

evidence be obtained annually, and that "annual findings are anticipated by [the statute] and best

reflect the requirements of the act."  *Pls.' Br*. at 18 (quoting Marine Mammal Commission's

statement, S-3 at 3).  Defenders additionally note that the IDCPA does not mention five-year

intervals, but does specifically mention yearly DMLs and financial budgets of the IATTC based

on annual schedules.

Defenders are correct that no mention of a five-year interval exists in the statute, and that

the statute does discuss per-stock per-year DMLs and a showing that a nation is meeting its

financial obligation in the IATTC.  *See* 16 U.S.C. § 1371(a)(2)(B)(ii).  Commerce does not

dispute that evidence supporting an affirmative finding must be submitted annually.  Yet, the

statute does not specifically require yearly submission of documentary evidence specifically from

foreign nations, and Defenders do not provide any evidence that Congress indicated that relevant

documentary evidence could be prepared and submitted only by the exporting nations

themselves. Therefore, the court will defer to Commerce's reasonable interpretation of the

statute.

In the *Interim-Final Rule*, Commerce provided that "NMFS will gather the necessary

documentary information through other channels (e.g. the Department of State and/or the IATTC), provided nations authorize the release of the information, instead of having each nation submit the information to NMFS on an annual basis. NMFS will evaluate this evidence and continue to make affirmative findings on an annual basis." 65 Fed. Reg. at 33. Additionally, Commerce added that upon request, nations will be required to submit documentary evidence to NMFS before the five-year moratorium. *See* 50 C.F.R. § 216.24 (f)(9)(i). With these statements in the *Interim-Final Rule*, Commerce provided additional means of obtaining information necessary to make annual findings, other than direct receipt from the exporting nations. Thus, Commerce did not promulgate a regulation contravening Congressional intent that findings be made annually; rather, Commerce does not require that documentary evidence supporting those annual findings be obtained directly from the nation seeking the affirmative finding annually. Defenders have not proved otherwise.[9]

       3.       The Tuna Tracking and Verification Program is in Accordance with Law.

Congress provided Commerce with much discretion in implementing a program for tracking and verifying the importation of tuna. The IDCPA directs Commerce to "issue regulations to implement this Act, including regulations to establish a domestic tracking and verification program that provides for the effective tracking of tuna labeled under subsection (d)

---

[9]Indeed, Congress clearly contemplated that documentary information on affirmative findings is not only acceptable if it comes directly from the exporting nation. In the IDCPA, Congress stated that Commerce may not accept documentary evidence from a harvesting nation if "the government of the harvesting nation does not provide directly or authorize the Inter-American Tropical Tuna Commission to release complete and accurate information to the Secretary in a timely manner. . . ." 16 U.S.C. § 1371(a)(2)(C)(i).

of this section." 16 U.S.C. § 1385(f).[10] Congress listed specific "minimum requirements" that

the Secretary must follow in promulgating the regulations, allowing the Secretary to "make such

adjustments as may be appropriate to the regulations promulgated under this subsection to

implement an international tracking and verification program that meets or exceeds the minimum

requirements established by the Secretary under this subsection." 16 U.S.C. § 1385(f)(7).[11]

---

[10]16 U.S.C. § 1385(d) provides:

(1) It is a violation of section 5 of the Federal Trade Commission Act for any producer, importer, exporter, distributor, or seller of any tuna product that is exported from or offered for sale in the United States to include on the label of that product the term "dolphin safe" or any other term or symbol that falsely claims or suggests that the tuna contained in the product were harvested using a method of fishing that is not harmful to dolphins if the product contains tuna harvested . . . (C) in the eastern tropical Pacific Ocean by a vessel using a purse seine net unless the tuna meet the requirements for being considered dolphin safe....

*See supra Section II (A)* of this opinion.

[11]16 U.S.C. § 1385(f). Specifically, Congress provided that the regulations must address:

(1) The use of weight calculation for purposes of tracking tuna caught, landed, processed, and exported.
(2) Additional measures to enhance current observer coverage, including the establishment of criteria for training, and for improving monitoring and reporting capabilities and procedures.
(3) The designation of well location, procedures for sealing holds, procedures for monitoring and certifying both above and below deck, or through equally effective methods, the tracking and verification of tuna labeled under subsection (d) of this section.
(4) The reporting, receipt, and database storage of radio and facsimile transmittals from fishing vessels containing information related to the tracking and verification of tuna, and the definition of set.
(5) The shore-based verification and tracking throughout the fishing, transshipment, and canning process by means of Inter-American Tropical Tuna Commission trip records or otherwise.
(6) The use of periodic audits and spot checks for caught, landed, and processed

The *Interim-Final Rule* establishes the Congressionally-mandated tuna tracking and

verification program.  First, the *Rule* enables tracking of  "dolphin-safe" and "non-dolphin-safe"

tuna during fishing operations in the ETP by requiring documentation of the date of trip, set

number, date of loading, name of vessel, vessel Captain's name, observer's name, well number,

weights by species composition, estimated tons loaded, and date of set on IDCP-approved Tuna

Tracking Forms ("TTFs").  *See* 50 C.F.R. § 216.94(a).  50 C.F.R. § 216.94(b)(1) provides that

"tuna caught in sets designated as 'dolphin-safe' by the vessel observer must be stored separately

from tuna caught in 'non-dolphin-safe' sets . . . except as provided in paragraph (b)(2) of this

section."[12]  One TTF is generated for tuna harvested in a "dolphin-safe" manner, and another for

tuna harvested in a "non-dolphin-safe" manner.  Additionally, the regulation requires tracking

during both offloading operations and canning operations.

The *Interim-Final Rule* also provides several verification requirements.  "Any exporter,

transshipper, importer, or processor of any tuna. . .  harvested in the ETP must maintain records

---

tuna products labeled in accordance with subsection (d) of this section.
(7) The provision of timely access to data required under this subsection by the
Secretary from harvesting nations to undertake the actions required in paragraph
(6) of this paragraph.


[12]50 C.F.R. § 216.94 (b)(2) allows for two conditions under which a "mixed" well is
acceptable.  First, if a set is designated "dolphin-safe," but during the loading process dolphin
mortality or serious injury is identified, the set will become "non-dolphin-safe."  If a well into
which the now "non-dolphin-safe" tuna are loaded already contains "dolphin-safe" tuna that was
loaded during a previous set, the observer will note the well numbers and the estimated weight of
the "non-dolphin-safe" tuna and identify the well as "mixed." Despite this provision in the
regulations, in practice mixed wells have not been used and the final rule will not permit mixed
wells. *See* Oral Arg. Tr. at 37.

related to that tuna for at least three years." [13]  Additionally, the program requires that within 30

days of receiving a written request, such records must be submitted to the Administrator.  50

C.F.R. § 216.94(e)(2).  Finally, "any such exporter, transshipper, importer, or processor must

provide the Administrator, Southwest Region, timely access to all pertinent records and facilities

to allow for audits and spot-checks on caught, landed, and processed tuna." 50 C.F.R. §

216.94(e)(3).  Defenders claim that Commerce promulgated a defective and illegal tracking and

verification program.  Defenders' claims are meritless; Commerce's tracking and verification

program meets Congressional requirements and is in accordance with law.

### a.       Documentation

Defenders complain that the tracking and verification program contains "serious and

substantial gaps in the paper trail." *Pls.' Br.* at 20.  First, Plaintiffs claim that an opportunity for

switching dolphin-safe with non-dolphin-safe tuna "has been exponentially expanded under the

new 50 C.F.R. § 216.93." *Id.* at 21.  Section 216.93 is entitled "Submission of Documentation,"

and remains largely unchanged from its predecessor.  Defenders assert that the section was

permissible prior to the enactment of the IDCPA, because "the previous legal regime, . . . was

completely dolphin safe, [and] there was basically no opportunity for switching dolphin-safe and

dolphin-unsafe tuna after documentation had been submitted to government officials." *Pls.' Br.*

at 20-21.  Yet, because dolphin-unsafe tuna is now permitted to enter the United States under the

---

[13]These records include: "FCO [Fisheries Certificate of Origin] and required
certifications, any report required in paragraph (a) and (b) of this section, invoices, other import
documents, and trip reports." 50 C.F.R. § 216.94(e)(1).  An FCO is a form that must accompany
all foreign tuna and related fish products imported into the United States under applicable
Harmonized Tariff Schedule ("HTS") numbers.

IDCPA, the regulation regarding submission of documentation is arbitrary and capricious.

Section 216.93 references other provisions of the *Interim-Final Rule*, which in turn impose various requirements for documentation. Additionally, as provided in §216.94(e)(1), records must be maintained for three years, and all documentation must be submitted to the agency upon request. *See* 50 C.F.R. § 216.94(e)(2). The court recognizes that the importation and sale of both dolphin-safe and non-dolphin-safe tuna in the U.S. provides more opportunity for confusion or outright fraud in contrast to the former scheme which prohibited any non-dolphin-safe importation or sale. However, this change was negotiated as part of the Panama Declaration as a condition of participation in the International Dolphin Conservation Program by tuna exporting countries and agreed to by the United States. By enacting the IDCPA Congress authorized the Executive Branch to implement this policy decision. The documentation requirements of the regulations provide for "verifications and tracking throughout the fishing, transshipment and canning process," "[p]eriodic audits and spot checks" and "timely access to data required" as the statute directs. 16 U.S.C. § 1385(f). Therefore, the regulation is not arbitrary and capricious as Plaintiffs claim.

Second, Defenders complain of "another significant paperwork problem," that imported tuna from foreign nations need not be accompanied by TTFs while in the United States. Rather, foreign nations need only provide "unverifiable summaries of tuna tracking forms." *Pls.' Br.* at 21. As such, Defenders state, the United States Customs Service's ("Customs") role in preventing illegally caught or labeled tuna from entering the United States is severely hampered. Commerce responds that the *Interim-Final Rule* does require that foreign tuna offered for sale or export in the United States be accompanied by "a listing of vessel names and identifying

numbers of the associated Tuna Tracking Forms for each trip of which tuna in the shipment originates." 50 C.F.R. § 216.92(b)(4). As such, Commerce will be able to determine the identifying number of the TTF and request the TTF itself if necessary. That the actual TTF will not automatically accompany tuna sold or exported in the United States, but is obtainable if necessary, does not render the documentation requirements lacking or ineffective.

Third, Defenders claim that the tracking and verification program is ineffective because the FCO forms no longer contain information on whether dolphins were encircled intentionally by purse seine nets in the ETP. Defenders assert that this lack of information provided in the FCO "seriously hampers" the role of Customs by preventing non-dolphin-safe tuna from entering the United States. *Pls.' Mot.* at 21.

Commerce responds by noting that this information--whether dolphins were encircled intentionally by purse seine nets--is now provided in the certification process, rather than through the FCO. Section 216.92(b)(3) provides that imported tuna offered for sale or export must be accompanied by "valid documentation signed by a representative of the appropriate IDCP member nation, certifying that: . . . [t]he tuna contained in the shipment were caught according to the dolphin-safe labeling standards of § 216.91." In turn, § 216.91(a)(1)(iii) provides:

> If the Assistant Administrator publishes notification in the Federal Register announcing a finding that the intentional deployment of purse seine nets on or encirclement of dolphins is having a significant adverse impact on any depleted stock:

Then only those tuna meeting the following two criteria will be considered dolphin-safe:

> (A) No tuna products were caught on a trip using a purse seine net intentionally deployed on or to encircle dolphins; and
> (B) No dolphins were killed or seriously injured during the sets in which the tuna were caught.

 Documentation of dolphin encirclement, while no longer provided in the FCO, is still required and still functions to prevent illegally-caught or labeled tuna from entering the United States. Defenders have therefore failed to show how this section of the *Interim-Final Rule* is ineffective.

Finally, Defenders claim that the *Interim-Final Rule* fails to provide a method of tracking foreign-caused dolphin mortality, because it does not place a duty upon foreign vessels to report to the United States Government, aside from the "flawed FCO." *Pls.' Br.* at 21-22.   According to Plaintiffs, the system therefore provides no assurance to United States consumers that the tuna they purchase is indeed dolphin-safe.  Commerce responds that Congress did not intend such public dissemination, but "[o]n the contrary, . . . provided that Commerce will 'establish appropriate procedures for ensuring the confidentiality of proprietary information, the submission of which is voluntary or mandatory.'" *Defs.' Br.* at 47 (quoting 16 U.S.C. § 1385(f)).

The court does not endorse Commerce's assumption that foreign-caused dolphin mortality is necessarily "proprietary information."  However, Congress did not specifically indicate that foreign-caused dolphin mortality must be reported on a level greater than the public status reports periodically provided by NMFS.  As the statute is silent on this subject, the court defers to Commerce's reasonable interpretation of the statute.  Commerce's failure to require public reporting of foreign-caused dolphin mortality is not a result of complete failure to consider an important aspect of the problem, and is certainly not so "implausible that it could not be ascribed to a difference of view or the product of agency expertise." *See Motor Vehicle Mfr. Ass'n,* 463 U.S. at 43.

### b.    Verification

The IDCPA directs Commerce to address in its regulations, "[t]he use of periodic audits

and spot checks for caught, landed, and processed tuna products labeled in accordance with subsection (d) of this section." 16 U.S.C. § 1385(f)(6). Defenders complain that the *Interim-Final Rule* does not address how these spot checks and periodic audits will occur. In its defense, Commerce states that it was required to do no more than specify that "[u]pon request. . . any such exporter, transshipper, importer, or processor must provide. . . access to all pertinent records and facilities to allow for audits and spot-checks on caught, landed, and processed tuna." 50 C.F.R. § 216.94(e)(3).

The statute does not direct the manner in which Commerce must conduct periodic verifications. Commerce interpreted the statute to evidence Congress' intent that the agency use its discretion in determining the methods and frequency of the verifications. That interpretation is rational, reasonable, and in accordance with law. Commerce might have provided additional guidance had the agency heeded the suggestions of the Marine Mammal Commission ("MMC") that Commerce "provide some sort of estimate. . . of effort it expects to make to track tuna under the tracking and verification program." AR S1-3 at 4. Yet, that Commerce did not indicate more specific directions to be followed in conducting the periodic audits and spot checks, is neither arbitrary nor capricious.

Defenders further assert that NMFS ignored the expertise of Customs in constructing the tracking and verification program, despite Congress' requirement that "[t]he Secretary, in consultation with the Secretary of the Treasury, shall issue regulations to implement this Act. . ." 16 U.S.C. § 1385(f). Notwithstanding Customs' response that it was unable and unwilling to monitor compliance with the dolphin-safe labeling requirements beyond examining the FCO form, NMFS "has attempted to thrust this responsibility onto Customs. . ." *Pls.' Br.* at 23.

Commerce evidenced its consultation with the Secretary of the Treasury in the *Interim-Final Rule*. *See* 65 *Fed. Reg*. at 31. ("In addition to publishing the proposed rule in the Federal Register, NMFS sent it to industry representatives, environmental groups, vessel and operator certificate of inclusion holders, importers, IDCP member nations, Department of State, IATTC, U.S. Commissioners to the IATTC, Department of the Treasury, U.S. Customs Service, Marine Mammal Commission, Department of Justice, and the Federal Trade Commission.") It is true that Customs responded that it was unable and unwilling to monitor compliance with the dolphin-safe labeling requirements beyond examination of the FCO form, and that the Interim-Final Rule "needs closer scrutiny." *Robert J. McNamara, Acting Assistant Commissioner US Customs Letter to J. Allison Routt, April 10, 2000; Plaintiff's Appendix E.* However, the degree to which Commerce incorporates Customs' comments into the final rule is firmly within Commerce's discretion. The IDCPA does not require Commerce to adopt Customs' proposed changes to the proposed rule. Thus, the court holds that the provision in the *Interim-Final Rule* on periodic audits and spot checks complies with the Congressional directive, and is therefore not arbitrary or capricious.

### c.     Jurisdictional Gaps

Defenders contend that the tracking and verification program also suffers from "serious jurisdictional gaps" among tuna-fishing nations in the ETP, in that "the rule does not address the real world possibility of U.S. purse-seine vessels offloading the tuna onto foreign (e.g. Mexican) trucks, storage facilities or carrier vessels, or vice-versa (i.e. foreign fishing vessels offloading to U.S. carriers)." *Pls.' Br.* at 23.

The IDCP states:

> If tuna is unloaded from a fishing vessel in port and subsequently loaded aboard a carrier vessel for transport to a processing location, the state under whose jurisdiction the fishing vessel operates shall be responsible for obtaining the TTFs,. . . and verifying that the dolphin safe tuna is kept separated from the non-dolphin safe tuna during the carrier loading and transporting process.

AR CO2-24 at Appendix 2, § 5.3.  Commerce provided in the *Interim-Final Rule* that, "[w]hen ETP-caught tuna is offloaded from a U.S. purse seiner in any port and subsequently loaded aboard a carrier vessel for transport to a cannery outside the jurisdiction of the United States. . . [t]he U.S. caught tuna becomes the tracking and verification responsibility of the foreign buyer when it is offloaded from the U.S. vessel."  50 C.F.R. § 216.94(b)(6)(ii).  As such, Plaintiffs claim, the *Interim-Final Rule* allows for a gap in which no country will possess tracking and verification responsibility when a U.S. vessel offloads ETP yellowfin tuna to a foreign carrier vessel.  According to Plaintiffs, this result contravenes the IDCPA.

"Defenders appear to be concerned about the potential for U.S.-caught tuna to be offloaded to a foreign carrier vessel, shipped to a foreign country, and then re-entered into the United States as a canned product." *Defs.' Br.* at 49.  Defendants respond that no such loophole exists, as imported tuna products, including canned tuna, must comply with the documentation requirements of sections 216.91 through 216.94.  Such documentation requirements will permit Commerce to track the imports back to the U.S. vessel originally harvesting the tuna.

Plaintiffs' argument that such loopholes exist and therefore violate the Congressional mandate that the final rule address "shore-based verification and tracking throughout the fishing, transshipment, and canning process. . . ." 16 U.S.C. § 1385(f)(5), is based on Plaintiffs' prior inferences and assumptions that the documentation submissions requirements of the *Interim-Final Rule* are inadequate.  The court holds in subsection (a), *supra*, of this opinion that the

documentation submissions are indeed adequate and in accordance with law. Commerce will be able to track imports and avoid Plaintiffs' hypothetical situation wherein no country is responsible for verifying the dolphin-safe status of ETP tuna.[14]

    4.      The *Interim-Final Rule* adequately addresses reduction of dolphin mortality.

Defenders claim that Commerce has illegally failed to implement incentives toward reducing or eliminating dolphin mortality. Furthermore, according to Plaintiffs, Commerce's *Interim-Final Rule* institutes incentives to maintain dolphin mortality at current levels. Defendants counter that Congress did not direct Commerce to issue regulations addressing incentives, and that therefore, the *Interim-Final Rule* is in accordance with law. The court holds that Commerce's interpretation of the statute as not requiring implementation of incentives toward reducing dolphin mortality is not arbitrary and capricious.

Congress clearly stated in the IDCPA that the objective of the entire tuna-dolphin program is to "progressively reduc[e] dolphin mortality to a level *approaching* zero through the setting of annual limits and the goal of eliminating dolphin mortality . . . ." *Pls.' Br.* at 26; 16 U.S.C. § 1371 (a)(2)(B)(iii) (emphasis added). While "getting to absolute zero on dolphin deaths . . . may not be possible," the IDCPA provides that the Secretary of State shall attempt to secure a binding international agreement to establish the IDCP requiring "a system of incentives to vessel

---

[14]Defenders go on to make an unsupported assertion that the same problem of no country receiving verification responsibility occurs when "foreign purse seine vessels partially unload ETP tuna onto U.S. carrier vessels that arrive into U.S. port." *Pls.' Br.* at 24 (citing 50 C.F.R. § 216.94(b)(4)). Plaintiffs state that partial unloading "raises serious new obstacles to effective tracking of dolphin-safe tuna," yet provides no support for such a statement, does not delineate the new obstacles, and does not indicate to the court any way in which this section of the *Interim-Final Rule* is contrary to law.

captains to continue to reduce dolphin mortality, with the goal of eliminating dolphin mortality."

*Pls.' Br.* at 26; 16 U.S.C. § 1412(8).

Both subsections of the statute mentioned by Plaintiffs reiterate the goals of progressively

reducing dolphin mortality and establishing incentives to do so.  However, neither requires that

Commerce promulgate regulations specifically addressing such incentives.[15]  Both the

International Agreement and the *Interim-Final Rule* address the issue of providing incentives for

lowering dolphin mortality, showing that Commerce has adequately carried out its statutory

obligation.  While the *Interim-Final Rule* does not specifically provide regulations outlining

incentives to reduce dolphin mortality, it notes that "the Meeting of the Parties established a

working group of which the United States is a member to develop incentives and rewards to

encourage vessel operators to lower dolphin mortality and serious injury." 65 Fed. Reg. at 37.

Additionally, as Defendants note, the Executive has achieved the objective of establishing

incentives to reduce dolphin mortality by launching the International Agreement, which seeks to

---

[15]The court agrees with Defendants' characterization of 16 U.S.C. § 1371 (a)(2)(B)(iii) as "merely hortatory in nature" in describing the objective of progressively reducing dolphin mortality.  *Defs.' Br.* at 53.  Subsection 1412(8) directs the Secretary of State to "seek to secure" a binding international agreement establishing a system of incentives to continue reduction of dolphin mortality, but does not demand that such incentives be firmly entrenched in the language of the *Interim-Final Rule*. Defendants additionally assert that §1412(8) is not subject to review by the court, as it requires that the executive initiate discussions with foreign nations, a task vested specifically in the President.  Judicial review of this subsection would therefore violate the principle of separation of powers. Defendants cite *Earth Island Institute v. Christopher*, 6 F.3d 648, 652 (9th Cir. 1993), for the proposition that the court cannot enforce a statutory provision requiring the Executive to initiate discussions with foreign nations. While it may be true that the court has no power to enforce this provision, Plaintiffs are attempting to prove that Commerce's regulation is contrary to the language of the statute; they are not asking the court to enforce a statutory provision.  As such, the court may construe the statute for purposes of determining whether the administrative agency's regulation is arbitrary and capricious.

build "a system that provides incentives to vessel captains to continue to reduce incidental

dolphin mortality, with the goal of eliminating dolphin mortality in this fishery...." *Int'l*

*Agreement*, Article V. 1.a.  Defenders have not shown that Commerce was required to

promulgate specific regulations addressing such incentives, and have not proved to the court that

Commerce did not carry out its Congressionally-mandated responsibility.

In addition to stating that no incentives exist in the *Interim-Final Rule* itself,  Defenders

cite several examples in which the *Interim-Final Rule* mandates a "penalty" for lack of

intentional sets on dolphins.  For instance, 50 C.F.R. § 216.24(c)(9)(iv)(A) provides,

> A vessel assigned a full-year DML that does not make a set on dolphins by April 1
> or that leaves the fishery will lose its DML for the remainder of the year, unless
> the failure to set on dolphins is due to *force majeure* or other extraordinary
> circumstances as determined by the International Review Panel.

Subsection (B) of that same provision states that a vessel assigned a DML for the second half of

the year "will be considered to have lost its DML if the vessel has not made a set on dolphins

before December 31. . . ."  50 C.F.R. § 216.24(c)(9)(vi) provides that a vessel desiring to fish in

the ETP on a limit basis may apply for a per-trip DML from the Administrator, and that

> [i]f a vessel assigned a per-trip DML does not set on dolphins during that trip, the
> vessel will be considered to have lost its DML unless this was a result of *force
> majeure* or other extraordinary circumstances as determined by the International
> Review Panel. After two consecutive losses of a DML, a vessel will not be
> eligible to receive a DML for the next fishing year.

Defenders further claim that the *Interim-Final Rule* provides a more severe penalty for not

utilizing a DML than for exceeding a DML.  Section 216.24(c)(9)(iv)(C) provides that any vessel

losing its DML for 2 consecutive years will not be eligible to receive a DML for the following

year.  Yet, section 216.24(c)(9)(v) provides that a vessel exceeding its assigned DML will merely

have its DML reduced for the subsequent year by 150% of the overage. Defenders conclude that not only are there no incentives to reduce dolphin mortality, but "the system is rigged to keep dolphin deaths at current unsustainable levels." *Pls.' Br.* at 27.

The court does not disagree that the *Interim-Final Rule* permits the maintenance of dolphin mortality at existing levels. Indeed, if a vessel seeks to preserve its allowed DML, it must make a set on dolphins. Yet, Defenders' claims that Commerce rigged the system to ensure the preservation of current dolphin mortality levels are no more than speculative. Defenders's argument conflates Dolphin sets and DMLs. The basic policy choice represented in the IDCPA is that improved techniques make dolphin sets safe if done properly. Even though DMLs are assigned to those vessels that set upon dolphins, it is to promote safe fishing practices. Assigning DMLs to vessels brings those vessels within the goals of the international agreement and promotes a reduction in dolphin mortality. Therefore, the regulations can be seen as entirely consistent with the IDCPA. Defenders have provided no evidence that Commerce has "illogically and illegally" contravened the IDCPA. The court defers to the agency's "greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated," and holds that the lack of specific incentives to eliminate dolphin mortality in the *Interim-Final Rule* are not arbitrary and capricious. *Brown & Williamson*, 529 U.S. at 132.

B.      *Defendants did not violate NEPA in promulgating the Interim-Final Rule and in Negotiating the Agreement on the International Dolphin Conservation Program.*

The National Environmental Policy Act ("NEPA"), enacted in 1969, requires federal agencies to consider the environmental impact of any major federal action. *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983). The Supreme

Court in *Baltimore Gas* stated that NEPA has two goals:

> First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.* 435 U.S. 519, 533 (1978).  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143 (1981).

*Id.* at 97.

NEPA created a Council on Environmental Quality ("CEQ") to ensure that its purposes were carried out; CEQ regulations apply to each federal agency, and require each federal agency to adopt supplementary NEPA procedures.  *See* 40 C.F.R. §§ 1507.1, 1507.3.

The environmental assessment ("EA") is "the first step in the NEPA process." *See Pls.' Br.* at 28.  The CEQ regulations define the EA as

> a concise public document for which a Federal agency is responsible that serves to:
> 1.       Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
> 2.       Aid an agency's compliance with the Act when no environmental impact statement is necessary.
> 3.       Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a).  As  Defendants note, "an agency will utilize an EA to ' make its determination whether to prepare an EIS.'" *Defs.' Br.* at 56 (quoting 40 C.F.R. § 1501.4(c)).  An Environmental Impact Statement ("EIS") is "an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1.  Section 102 of NEPA, codified at 42 U.S.C. § 4332, provides that

[A]ll agencies of the federal government shall–

. . . .

(c) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –

>  (i)     the environmental impact of the proposed action,
>  (ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented,
>  (iii)   alternatives to the proposed action,
>  (iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>  (v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

On December 8, 1999, Commerce issued an EA with respect to the *Interim-Final Rule*, in which the agency determined that the *Rule* "would not significantly affect the quality of the human environment, and that the preparation of an environmental impact statement on these actions is not required by Section 102(2) of the National Environmental Policy Act or its implementing regulations." *EA.* at 58.  Defenders contend that the Government has violated "NEPA, CEQ regulations, and the duty to implement their own NEPA regulations by producing a defective and illegal environmental assessment, failing to complete an environmental impact statement, and neglecting to take a 'hard look' at the environmental impacts of the new tuna/dolphin program and all reasonable alternatives."  *Pls.' Br.* at 28.  The court holds that Defendants' application of NEPA to the *Interim-Final Rule* and the International Agreement  on the IDCP is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

1.      The EA is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The EA must provide evidence and analysis for the determination of whether to prepare an environmental impact statement or finding of no significant impact, and must "include brief discussions of the need for the proposal, of alternatives. . ., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(b).  NEPA prescribes several guidelines for agencies to follow in order to adequately carry out the policies of the act.[16]  Defenders claim that the EA "fails any objective test of accurate information, sound analysis or reasonable alternatives." *Pls.' Br.* at 29.  Specifically, Plaintiffs assert that the NMFS failed to include the best scientific information available in the EA, that the EA contains "fundamental analytical flaws," and that there was inadequate public involvement and other problems with the process of preparing the EA.  Defenders fail to show

---

[16]For instance, 42 U.S.C. § 4332(2) requires that the agencies

(A)     utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences,

. . . .

(B)     identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration...study, develop, and describe appropriate alternatives to recommended courses of action

. . .

(C)     recognize the worldwide and long-range character of environmental problems,

. . .

(H)     initiate and utilize ecological information in the planning and development of resource-oriented projects. . . .

the court that the NMFS committed error in preparing the EA, and certainly fail to convince the court that the EA is defective and represents an abuse of agency discretion.

### a.      Best Available Scientific Information

The IDCPA directed Commerce to submit a report containing the results of  a research program involving abundance surveys and stress studies, on "the effect of intentional encirclement (including chase) on dolphins and dolphin stocks incidentally taken in the course of purse seine fishing for yellowfin tuna in the eastern tropical Pacific Ocean."  16 U.S.C. §1414a(a)(1).  The Report was to "address the question of whether such encirclement is having a significant adverse impact on any depleted dolphin stock in the eastern tropical Pacific Ocean." *Id.*  On March 25, 1999, the Report on the Initial Finding was submitted, and concluded that "the information suggests but by no means conclusively that the fishery has been the source of significant adverse impact on these two populations (northeastern offshore spotted and eastern spinner dolphins.)" *Report*, AR S2-21 at 22.  Defenders assert that the NMFS was obligated to reply on the 1999 Report as the best available scientific evidence, in preparing the EA. *See* AR S2-21.  According to Defenders, Commerce's failure to rely on the Report contravened NEPA.

NEPA does not require Commerce to use the "best available scientific evidence" in preparing the EA.  The CEQ regulations state that environmental information "must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).  The court does not dispute that NEPA demands accurate information; yet, Defenders provide no authority for their proposition that the

information relied upon must be the best scientific evidence available.[17]

Defenders claim that "[n]one of the Report's analysis or conclusions are reflected in the

EA." *Pls.' Br.* at 29. In support of their assertion, Defenders state that the EA fails to cite the

Report as well as four research documents prepared for the Report, that Defendants "illegally and

arbitrarily ignored this crucial information," and that instead of relying on the report, Defendants

chose to rely on "abundance estimates from dated surveys conducted from1986 to 1990 on the

three depleted dolphin stocks," evidencing an "obvious disconnect between the EA and the

Report to Congress." *Pls.' Br.* at 30. The court rejects the argument that failure to cite the

Report and citing previous abundance estimates show that Commerce ignored the Report's

conclusions and analysis in the EA. In fact, it seems that the EA and the Report harbor precisely

the same conclusions. For instance, the Report states that in determining the adverse impact of

purse seine net fishing on dolphins, "[t]he data are not entirely conclusive, nor will they ever be

so, even with many additional years of information." *Report* at 22. In the EA, Commerce noted

that "NMFS found that there was insufficient evidence that chase and encirclement by the tuna

---

[17] Even if Commerce were bound by the "best scientific evidence" standard, there is no indication, other than Plaintiffs' assertion, that the 1999 Report is indeed the best scientific evidence available. The Report concerned the *Initial Finding*, in which Commerce found that there was "insufficient evidence that chase and encirclement by the tuna purse seine fishery 'is having a significant adverse impact' on depleted dolphin stocks in the ETP," and provided that tuna products from the ETP could only be labeled "dolphin-safe" if "no dolphins were killed or seriously injured during the set in which the tuna were caught." *Initial Finding*, 64 Fed. Reg. at 24590. The *Interim-Final Rule* covers a much broader spectrum than the *Initial Finding*. In addition to changing the standard for the use of the "dolphin-safe" label, the *Interim-Final Rule* concerns the implementation of an international system for allowing the entry of yellowfin tuna into the United States from nations complying with the IDCP as well as the establishment of a tuna tracking and verification program. Thus, it is uncertain whether the best information available to rely upon in preparing an *Environmental Assessment* on the *Interim-Final Rule*, would unquestionably be a Report generated in preparation for the *Initial Finding* on the standards for dolphin-safe labeling.

purse seine fishery 'is having a significant adverse impact' on depleted dolphin stocks in the ETP," and eventually concluded that the establishment of new standards for importing yellowfin tuna would not significantly affect the quality of the human environment. *EA* at 8, 58. Furthermore, as Defendants note, Commerce did consider the different labeling standards implicated by the 1999 Report.[18] The EA is a continuation and expansion of the research in the Report, rather than a departure from the principles in the Report. Indeed, "actions in the categories of labeling, trade restrictions and embargoes work together, not independently. They are intended to reinforce each other and should be viewed as interdependent parts of an overall strategy to carry out the IDCPA." *EA* at 5-6. The court agrees with Defendants, and holds that Commerce's failure to specifically cite to the 1999 Report in the EA was not error.

        b.    **Analysis**

        Defenders claim that the EA is fatally defective in that it contains fundamental analytical flaws. First, Defenders assert that because Commerce neglected to base the EA on the 1999 Report to Congress, it omitted the leading scientific studies on dolphin biology and conservation, thereby producing flaws which are "highly significant and prejudicial." *Pls.' Br.* at 30-31. Defenders claim that the EA incorrectly states that the eastern spinner and northeastern offshore spotted dolphin stocks are stable or slightly increasing. *See id.* at 31. According to Plaintiffs,

_____

        [18]Under the first labeling alternative, status quo, "[t]he dolphin-safe label would only be used on tuna caught by a vessel that did not set on dolphins throughout its entire trip." *EA* at 6. Pursuant to Alternative 2, the preferred alternative, "dolphin-safe" would mean that "no dolphins were killed or seriously injured during the sets in which tuna were caught." *Id.* at 8. Under Alternative 3, the preferred alternative with adjustments, the dolphin-safe label would be permitted if "no dolphins were intentionally encircled to catch tuna during the entire trip, and no dolphins were killed or seriously injured during the set in which the tuna were caught...." *Id.* at 11.

such conclusions are contrary to the Report, which states that the northeastern offshore spotted dolphin population declined from 1991 to 1998, and that the eastern spinner dolphin population was nearly stable or declined slightly from 1991 to 1998. *See id.* at 31.

Commerce has not ignored this relevant scientific data as Defenders claim. First, regarding the allegedly inconsistent conclusions of the Report and the EA, Defenders are correct that the EA states, "all stocks, including the depleted eastern spinner stock and the northeastern offshore spotted stock, are stable or slightly increasing. . . ." *EA* at 42. However, that statement, as Commerce indicates, refers to the growth of the dolphin stocks overall for the past two decades, whereas the statements in the Report regarding the stable or decreasing populations of northeastern offshore spotted dolphins and eastern spinner dolphins refer only to the seven-year period between 1991 and 1998. A slightly declining dolphin stock of one species between 1991 and 1998 does not exclude the possibility that generally, dolphin stocks have been stable or slightly increasing, but have "fluctuated around the same levels for the past two decades." *EA* at 42. Defenders have not proved to the court that the EA stands in "stark contrast" to or is even moderately inconsistent with the Report regarding the health of these depleted dolphin stocks.

Defenders also claim that the EA illegally fails to address "the adverse effects of the purse-seine fishery upon dolphin stocks." *Pls.' Br.* at 31. Specifically, the EA did not mention findings in the Report which indicated that in spite of reported decreases in observed or reported dolphin mortality, the stress effects of purse-seine fishing on dolphin stocks prevents these species from recovering. According to Plaintiffs, Commerce failed to acknowledge the Report's findings that dolphins suffer muscle damage from purse-seine nets, which can cause unobserved mortality, disruption of the reproduction cycles of female dolphins, and cow-calf separation,

which results in a high number of unreported dolphin deaths.  Defenders claim that the EA

"makes no mention of these highly relevant scientific conclusions in clear violation of NEPA."

*Pls.' Br.* at 32.

The court does not agree that Commerce's failure to cite to the Report or recount the

peculiar stress effects on dolphins from purse seine fishing constitute clear violations of NEPA.

Nowhere in the CEQ regulations is there a provision requiring Commerce to adhere to a

particular scientific report or its findings in preparing an EA.  Moreover, while Commerce did

not specifically cite to the Report or the peculiar stress effects on dolphins from purse seine

fishing, Defenders are wrong in their assertion that Commerce did not consider the effects of

purse seine fishing on dolphins.  Commerce's impact analysis examined "three 'combinations' of

actions; the status quo, the preferred alternative, and an alternative (Alternative 3) which

represents an adjustment of discretionary aspects of the preferred alternative." *EA* at 5.  Under

the status quo alternative, "existing regulations would remain in place and activities would

continue under the voluntary IDCP." *Id.* at 6.  Commerce determined that under this alternative,

dolphin mortality due to purse seine fishing "by the U.S. fleet is expected to continue to range

from approximately 0 to 100 animals per year, while total ETP dolphin mortality would likely

remain at the level of 1,900 to 5,000 animals per year, consistent with the IDCP." *Id.* at 42.

Under the preferred alternative, new requirements under the *Interim-Final Rule* would be

established.  *See id.* at 7.  If U.S. purse seine vessels did not switch to setting on dolphins, and the

levels of incidental dolphin mortality from foreign purse seine fishing remained at current levels,

"the expected impacts on marine mammal stocks from the preferred alternative would be similar

to those impacts identified under [the status quo alternative]." *Id.* at 47.  Even if U.S. purse seine

vessels did switch to setting on dolphins, limits on mortality of individual dolphin stocks

established under the Agreement on the IDCP should prevent the purse seine fishery from having

"a significant impact on any dolphin stocks in the ETP." *Id.* at 48.  Finally,  "[a]lternative 3

would retain the clearly required elements of the preferred alternative, but it would also include

other measures . . . not specifically required by the IDCPA or the Agreement on the IDCP." *Id.* at

11.  The third alternative "would be expected to result in faster reductions in dolphin mortality

from intentional sets on dolphins than would be expected under the preferred alternative and the

status quo." *Id.* at 54.   While the Report's scientific conclusions regarding stress on dolphin

populations as a result of purse seine fishing may be relevant, their lack of presence in the EA

does not prove that Commerce has not provided "sufficient evidence and analysis for determining

whether to prepare an environmental impact statement...."  40 C.F.R. §1508.9(a).

### c. Public Involvement.

Plaintiffs assert that Commerce failed to provide adequate public involvement in the

NEPA process.  *Pls.' Br.* at 35.  Plaintiffs' concerns center around three points.  First, that

Commerce failed to accept public comments on the draft EA.  Second, that Commerce failed to

adequately involve other agencies and departments so that NEPA could have "guided the

promulgation of the final rule." *Pls.' Br.* at 36.  Third, that defendants failed to make the Finding

of No Significant Impact (FONSI) available for public review for 30 days before the agency

makes its final determination whether to prepare an EIS.

Plaintiffs rightly point out that public involvement is a central element in the NEPA

process. 40 C.F.R. § 1506.6.  The process set up by NEPA ensures that the agency will inform

the public that it has indeed considered environmental concerns in its decisionmaking process.

*Baltimore Gas & Electric Co.,* 462 U.S. at 97.  However, a court's role is limited in reviewing an agency's actions under NEPA.  It must determine if the agency adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.  *Id* at 98.  An examination of Defenders' three specific claims shows they do not demonstrate arbitrary or capricious acts or omissions on the part of the agency in this case.

Plaintiffs complain that the draft EA was not made available for public comment prior to issuance of the final rule.  *Pls.' Br.* at 36.  Under the law there are limited occasions when a draft EA must meet the same procedural requirements as an EIS.  One of these occasions is when it is the functional equivalent of an EIS.  *Save Our Ecosystems v. Clark* 747 F.2d 1240, 1247 (9th Cir. 1984).  In *Clark,* the EA was used on an annual basis to evaluate the need to modify an existing EIS.  The EA essentially operated as a annual EIS and, therefore, the court held it must follow the same procedures, which otherwise do not bind an EA.  In this case the EA is not substituting for an EIS.  Instead the EA is performing its traditional purpose – to determine if an EIS is needed.  Commerce properly found an EIS was not needed, negating the need for the more onerous regulatory procedures an EIS would trigger, including a public comment period on the draft EA.

Defenders also claim the NEPA process was flawed at the interagency level by lack of public involvement. *Pls.' Br.* at 36.  Defenders breaks this claim into two separate claims.  First, that NEPA required coordinating with other branches before the negotiation of the International Agreement.  This claim is apparently related to Plaintiffs' contention that the International Agreement, and not just the final rule, required application of the NEPA process.  For reasons discussed below the court rejects this argument.  *See infra* section B.2.  Second, Defenders claim there was inadequate consultation between Commerce and the State and Treasury Departments.

*Pls.' Br*. at 36.  With regard to the State Department this allegation seems absurd, since it was the agency responsible for negotiating the agreement--a prerequisite for Commerce to begin the rule-making process.  With regard to Treasury, and the United States Customs Service in particular, the EA is clear that Customs' role was considered.  The Administrative Record notes several concerns that Customs raised during the notice and comment period.  AR XII-287; *Pls.' Br*. at 33.

The last element of Defenders' contention that lack of public involvement makes the final rule in  violation of NEPA, is that the Finding of No Significant Impact (FONSI) was not available for public review for 30 days before the agency made its final determination.  *Pls.' Br*. at 37.  Defenders acknowledge that the 30 day requirement is applicable in only two instances.  First, when the proposed action is, or is closely similar, to one which normally requires the preparation of an EIS.  Second, when the nature of the proposed action is without precedent.  Defenders, however, make no attempt to explain why the final rule meets one of these two criteria, or support the argument in other ways.  Even giving the Plaintiffs the benefit of the doubt, the argument does not withstand scrutiny.  As discussed elsewhere in the opinion, the action does not require an EIS, the EA is not a substitute for an EIS, nor is the proposed action without precedent.  As the government points out, in January 1999 Commerce conducted an EA with respect to management and conservation measures pursuant to the Pacific Tunas Conventions Act.  AR VIII-120.  That EA examined the effects of a proposed action upon dolphin stocks in the ETP.  This is in addition to the quarter century of government action pursuant to various incarnations of the Marine Mammal Protection Act.  The history of this controversy is replete with public involvement which affected government policy significantly.

*See supra* n.1.  Plaintiffs' specific claims do not convince the court that the government has acted improperly in this latest phase with regard to its obligation to involve the public.

> 2.    Defendants' failure to prepare an EIS was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Defenders claim that Defendants violated NEPA by declining to prepare an EIS for the *Interim-Final Rule*.  Plaintiffs state in their brief, "it is quite difficult to understand how an entirely new regulatory regime for a major fishery, which will alter trade embargoes in place for a decade, and which will undeniably affect both depleted species of dolphins and endangered sea turtles, could somehow avoid the preparation of an EIS."  *Pls.' Br.* at 38.  The court examines this claim beginning with the purposes of preparing an EIS.

The Government is required to prepare an EIS when a proposed major federal action will significantly affect the quality of the human environment.  Plaintiffs correctly note that no single test exists to determine when these conditions are met.  *See Pls.' Br.* at 38.  Other circuits have employed a four-part test to evaluate an agency's finding of "no significant impact."  *See Sierra Club v. Peterson*, 717 F. 2d 1409, 1413 (D.C. Cir. 1983).  The court reviews:

(1) whether the agency took a "hard look" at the problem;
(2) whether the agency identified the relevant areas of environmental concern;
(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was significant; and
(4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Id.* (citations omitted).  Defenders cite *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211-12 (9th Cir. 1998), which notes the standard in the Ninth Circuit for reviewing an agency decision not to issue an EIS.  "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why

potential effects are insignificant." *Id.* (quoting *Save the Yaak Committee v. Block*, 840 F. 3d 714, 717 (9th Cir. 1988)).  The appeals court in *Blue Mountains* additionally stated, "we must defer to an agency's decision that is 'fully informed and well considered.' However, we need not forgive a 'clear error of judgment.'" 161 F.3d at 1211 (quoting *Save the Yaak*., 840 F. 2d at 717; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989)).

Plaintiffs claim that the final tuna/dolphin program is "major" and "significantly affects" the environment.  The CEQ regulations define "major federal action" and "significantly" as these terms apply in the context of an EIS.  "'Major Federal Action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility.  Major reinforces but does not have a meaning independently of significantly." 40 C.F.R. § 1508.18.  Whether something is significant, "requires considerations of both context and intensity." 40 C.F.R. § 1508.27.  "Context" means that the significance of an action is measured in "several contexts such as the society as a whole. . . , the affected region, the affected interests, and the locality." *Id.*  "Intensity. . . refers to the severity of impact," and includes ten specific factors to be considered in its evaluation.  *Id.*

One of the factors to be evaluated in the intensity inquiry is "the degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.* at § 1508.27(b)(4).  Defenders state correctly that the tuna/dolphin issue is controversial.  Defenders assert that controversy exists over the biological health of the three depleted dolphin stocks, regarding the implementation of the tracking and verification system, the enforcement mechanism, and the overall biological health of the ETP marine ecosystem.  *See Pls.' Br.* at 40.  Another factor to be considered in determining intensity is the "degree to which the possible

effects on the human environment are highly uncertain or involve unique or unknown risks." 40

C.F.R. § 1508.27(b)5.  Citing the court's opinion in *Defenders of Wildlife v. Dalton*, 24 CIT ___,

97 F. Supp. 2d 1197 (2000), Defenders claim that lifting tuna embargoes and responding to

international trade pressure in accordance with the International Agreement is both unique and

uncertain.

Defenders also assert that the tuna/dolphin program meets another intensity factor, in that

it "represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6).

Plaintiffs claim that the length and complexity of the *Interim-Final Rule* is one indication of this

intensity, and that "[t]he international agreement is, by all accounts, a significant experiment in

whether multi-national cooperation can achieve ecological sustainability in the eastern tropical

Pacific Ocean." *Pls.' Br.* at 41.  Additionally, Defenders claim that the high "degree to which the

action may adversely affect an endangered or threatened species" is evidenced by the five species

of sea-turtles taken incidental to fishing operations in the purse seine tuna fishery.  Finally,

Defenders state that "the tracking and verification program, the lack of dolphin mortality limit

reduction toward a level approaching zero, and certain provisions of the international agreement

'threaten' a violation of the MMPA. . . . " *Pls.' Br.* at 43 (referring to Section 1508.27(b)(10),

which requires that in evaluating intensity, "responsible officials" must consider "[w]hether the

action threatens a violation of Federal, State, or local law or requirements imposed for the

protection of the environment.")

Commerce's main defense on this point is that the IDCP negotiations were not concrete

enough to constitute a "major federal action significantly affecting the quality of the human

environment." *Def.'s  Br.* at 68.  Commerce cites *Public Citizen v. Office of the United States*

*Trade Representative* for the proposition that NEPA  "specifically identifies the time when an

agency's action is sufficiently concrete to trigger the EIS requirement," and that no such

triggering event had occurred with respect to the IDCP negotiations, as there was no guarantee

that an agreement would be reached. 970 F.2d 916, 918 (D.C. Cir. 1992). Commerce additionally

responds that the conclusion of the International Agreement on the IDCP also did not require an

EIS.  According to Commerce,  the International Agreement did not itself affect the environment,

but merely provided for conditions by which Commerce could promulgate regulations for lifting

the tuna embargos upon harvesting nations.  As such, the International Agreement did not

constitute major federal action "significantly affecting the quality of the human environment." 42

U.S.C. § 4332(C).

Although Commerce's decision not to prepare an EIS "can only be overturned if the

decision was arbitrary, capricious, or an abuse of discretion," the court must still "insure that the

agency took a 'hard look' at the environmental consequences of its decision."  *Peterson*, 717 F.2d

at 1413.  In the EA, the NMFS provided "sufficient evidence and analysis for determining

whether to prepare an environmental impact statement or a finding of no significant impact." 40

C.F.R. § 1508.09(a)1.  The thorough analysis in the EA also demonstrates that the agency

considered the environmental consequences seriously enough to constitute the "hard look"

required.

The EA describes the progression of the international and domestic legislation leading up

to the *Interim-Final Rule,* which shows that the rule was intended to formalize compliance with a

dolphin protection program, the main tenets of which were already being followed by the ETP

nations, including the United States.  The EA notes that "[b]y 1993, nations fishing in the ETP

under the La Jolla Agreement reduced dolphin mortality to less than 5,000 dolphins annually, six

years ahead of the reduction schedule established in that agreement." *EA* at 3.  The La Jolla

Agreement was the impetus behind the 1995 signing of the Panama Declaration, which

"established conservative species/stock-specific annual dolphin mortality limits and represented

an important step toward reducing bycatch in the ETP tuna fisheries and implementing sound

ecosystem management." *Id.* at 4.  The IDCPA, signed into law by Congress on August 15, 1997,

"was the domestic endorsement of the La Jolla Agreement, incorporating elements of the Panama

Declaration, adopted under the auspices of the IATTC." *Id.*  In turn, the IDCPA, combined with

the Panama Declaration, "became the blue print [sic] for the Agreement on the IDCP." *Id.*  The

*Interim-Final Rule* was promulgated to implement the IDCPA.  It did not fundamentally change

the tenets of the La Jolla Agreement or the Panama Declaration, with which tuna-harvesting

nations in the ETP were already bound to comply.  As such, it would not significantly affect the

quality of the environment.

The extent of NMFS's investigation presents solid support that it took the required hard

look.  The EA detailed the impact on the affected environment, the environmental impacts of

three different alternatives, and the related socio-economic impacts. *EA* at 16, 40.  The EA culled

its information from two significant studies completed in 1993 and 1991, and subsequent annual

reports by the IATTC.  *Id.* at 18.  The breadth of the impact considered, the depth of the research

referenced and the various possibilities considered all point to a careful examination of the

environmental effects of the IDCPA, and as such constitute a hard look.

NMFS has properly shown that approval of the *Interim-Final Rule* to implement the

IDCPA "would not significantly affect the quality of the human environment, and that the

preparation of an environmental impact statement on these actions is not required by Section

102(2) of the National Environmental Policy Act or its implementing regulations." *EA* at 58.

Plaintiffs may disagree that the provisions of the *Interim-Final Rule* adequately protect dolphins

in the ETP. Yet, Defenders have not shown the court how Defendants committed a "clear error

of judgment" or why the court should not defer to Commerce's decision not to prepare an EIS.

As such, the court holds that the failure of Commerce to prepare an EIS does not violate NEPA.

*C . The Affirmative Finding with regard to Mexico*

Under the IDCPA, Congress directed the Department of Treasury to lift the embargo

against tuna imports from a country if the Secretary of Commerce made specific positive findings

with regard to that country. 16 U.S.C. § 1371 (a)(2)(B). The statute requires a country meet the

following criteria: 1) the nation participates in the International Dolphin Conservation Program,

and is either a member of the Inter-American Tropical Tuna Commission or has initiated all steps

required of applicant nations; 2) the nation is meeting the obligations of the IDCP and the

obligations of membership in the IATTC, including all financial obligations; 3) the total dolphin

mortality limits (DMLs), and per-stock per year dolphin mortality limits permitted for that

nation's vessels under the IDCP do not exceed the limits determined for 1997, or for any year

thereafter, consistent with the objective of progressively reducing dolphin mortality to a level

approaching zero through the setting of annual limits; 4) the nation provides directly or asks the

IATTC to release complete and accurate information to the Secretary in a timely manner to allow

determination of compliance with the IDCP and relevant parts of the Dolphin Protection

Consumer Information Act; 5) the nation is not consistently failing to take enforcement actions

on violations which diminish the effectiveness of the IDCP.

Plaintiffs contend the Secretary of Commerce's affirmative findings for Mexico were flawed on five counts. First, Plaintiffs assert Mexico is not meeting its obligations under the IDCP and IATTC in four ways.[19] *Pls.' Br.* at 56. The second claimed flaw in the Secretary's Mexican affirmative finding is that Mexico is failing to meet its financial obligations under the IATTC; third, the Secretary disregarded the increased Dolphin Mortality Limits assigned to Mexico in 2001; fourth, that severe problems exist in the Mexican tracking and verification system; and fifth, that the Secretary's findings ignore repeated and serious violations of the IDCP by Mexican vessels due to lax Mexican enforcement.

This court evaluates Defenders' assertions that the Secretary's affirmative finding was flawed under the APA's "arbitrary and capricious" standard. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971); *see also* 5 U.S.C. 706(2)(A)-(D). In addition, the court acknowledges that the findings are based on unique circumstances. The Secretary is making findings using a domestic standard embodied in the law and the international standards to which the U.S. law makes reference. When Plaintiffs' claims are examined using the appropriate standard of review it is clear many of them do not have merit, and none withstand scrutiny.

1.        Mexican violations of IDCP obligations

 **Sundown Sets:** Without much support or explanation Plaintiffs contend Mexico's

---

[19] The four ways are: 1) Mexican regulations incorrectly define sundown sets; 2) Mexico is not conducting research for purpose of seeking ecologically sounds means of capturing large yellowfin tunas not in association with dolphins; 3) Mexican regulations provide no incentives to vessel owners or their captains to reduce dolphin mortality with the goal of eliminating dolphin mortality in this fishery; and 4) Mexico's intransigence has hampered important scientific research on stress impacts on affected dolphin populations.

definition of sundown sets is contrary to the IDCP. *Pls.' Br.* at 56. In fact, Mexico's definition permitting sets that finish backdown procedures 30 minutes after sundown is the standard under the International Agreement. Annex VIII 3(e). This is true regardless of whether the domestic standard for United States vessels is 30 minutes before or after sundown. Therefore, this claim is without merit.

**Research:** Plaintiffs claim Mexico is bound by the agreement to undertake research for the purpose of seeking ecologically sound means of capturing large yellowfin tunas not in association with dolphins. *Pls. Br.* at 56. This obligation is not as strict as Plaintiffs claim. The research program is one of several measures that the Parties to the international agreement will adopt and implement pursuant to the program. Art. V(1)(h). The agreement does not require a full program be operational the first year of the new regime. In fact, the U.S. law which Plaintiffs cite as the benchmark gives great discretion to our government. It requires the Secretary issue regulations for U.S. vessels operating in the ETP, "allowing for the authorization and conduct of experimental fishing operations, under such terms and conditions as the Secretary may prescribe." 16 U.S.C. § 1413(a)(2)(B)(x). The IDCP also conceives of future research efforts, but does not indicate a firm starting date. *See* Art VII. Plaintiffs, thus, ask Commerce to find Mexico in non-compliance with a provision in the IDCP that has no agreed starting date, and which U.S. regulations do not make mandatory. In this context Commerce's finding that Mexico is compliant with the IDCP, even if it is slow to participate in a research program, does not rise to "arbitrary or capricious or otherwise not in accordance with the law."

**Incentives**: Plaintiffs' contention that Mexico is not in compliance with the IDCP for failure to provide incentives to vessel owners in their regulations "with the goal of eliminating

dolphin mortality in this fishery," does not withstand scrutiny. *Pls.' Br.* at 56. Under the IDCP,

the incentive program is one of several methods to "limit total incidental dolphin mortality in the

purse-seine tuna fishery in the Agreement Area to no more than five thousand annually." Art

V(1). While the hard cap of five thousand is an immediate restriction, the multiple methods

specified in the agreement to achieve a lower future total are not all required to be immediately

effective. The incentive program, like some of the other methods for mortality reduction, are

multilateral efforts that were not fully described at the program's inception. Therefore, clearly,

the parameters of the incentive program are not in place, and are not required to be at this point.

Consequently, the Secretary of Commerce was not acting contrary to the law when he did not

hold Mexico to such a stringent standard with regard to incentives for vessel captains and

owners.

**Intransigence**: The last Mexican violation of the IDCP Plaintiffs assert is "past Mexican

Government intransigence" toward supporting scientific research related to "stress impacts on

affected dolphin populations." *Pls.' Br.* at 57. Plaintiffs do not specify what level of cooperation

is necessary to avoid "intransigence." They do cite, however, several points in the record. AR

XV - 538, 576, 577. These documents refer primarily to the Mexican Government's

unwillingness to permit necropcies (autopsies) on dolphins killed by Mexican tuna fishing

vessels. The research program, like the incentive program, is framed as a collective effort--not

one that every country implements on its own. The IDCP specifies that it is to be done within the

framework of the IATTC. Art V.1.c. The NMFS received notice of compliance from the Mexican

Government and the IATTC Director. The IATTC specifically said Mexico, "is complying with

the conservation program established by the Commission." AR MAF. Vol I - 50. p.2. Based on

this evidence, and in the absence of a clarification how reluctance to allow necropcies amounts to systematic intransigence, the court holds that the Secretary was not acting arbitrarily or capriciously in finding Mexican compliance with the IDCP scientific research program.

2.      Mexican failure to meet IATTC financial obligations

Under the IATTC the parties to the convention agree to pay "joint expenses" related to the proportion of the total catch from the fisheries covered by the Convention.   The share of expenses is determined by a recommendation of the Commission and approved by the High Contracting Parties.  AR S2-1.  Plaintiffs ask this court to find that Mexico is deficient in payment because the amount of its dues is not directly proportional to the amount it catches. The government questions whether this court has jurisdiction to determine a proper allocation of fees among the contracting parties.  Fortunately for the court, it does not have to reach that question. We must only review whether the Secretary of Commerce's decision to accept the IATTC's confirmation that Mexico met its financial obligation as determined by the Commission and the High Contracting Parties was arbitrary or capricious.  The court finds it is not.  Clearly, the Secretary was within his discretion to accept the recommendation made pursuant to the explicit terms of the agreement.

3.      Mexican increased DML

Plaintiffs claim Mexico is not adhering to the Dolphin Mortality Limits (DMLs).  In 2000, the Mexican fleet was assigned a DML of 1826.  For 2001, the Mexican total DML is 2565. Defenders assert that the increase in the DML assigned under the international agreement violates the statutory requirement by exceeding its total annual limits "for any year thereafter." *Pls.' Br.* at 58. The Secretary relied on a determination made by the IATTC that "no Mexican

tuna purse-seine vessel that was allocated a Dolphin Mortality Limit during the 1999 fishing year exceeded its DML." AR MAF-41; Def. Appendix 22.  Though the Plaintiffs are not clear on exactly why an increase from one year to the next is contrary to the statutory requirements, it appears there are two different understandings of what it means to exceed the limits for 1997 or any year thereafter.  Plaintiffs view this language as a one-way ratchet; the 1997 limits can never be exceeded, nor can any subsequent allocation exceed the 1997 limit.  An alternative reading would understand the language to mean that governments are bound by annual allocations, and cannot exceed those allocations in the corresponding year.  In addition, as the Defendant points out, whether Mexico exceeds its allocation for 2001 is not relevant to the determination of the Secretary in 2000.  *Defs.' Br.* at 78. The limited question is whether the Secretary's determination that Mexico did not violate the DML's assigned to its vessels between 1997 and 1999 was arbitrary or capricious.  There is significant evidence in the record to support that conclusion, and therefore the Secretary's determination was proper. AF MAF-52, p. 4 .

4.      Tracking and Verification System

Plaintiffs claim the Mexican tracking and verification System is flawed to such a degree that it is not in compliance with the IDCP or with the statutory requirement that it provide adequate data to the United States for the purpose of Commerce's findings.  Specifically, they complain Mexican Tuna Tracking Forms (TTFs) are not publicly available; the Mexican regulations do not specify how TTFs are transmitted to the IATTC; there is no evidence in the record indicating the level of Mexican resources allocated to implement the tracking system; and there is no evidence in the record that the Mexican Government has accounted for the "'no encirclement standard' of dolphin safe tuna pursuant to *Brower v. Evans*." *Pls.' Br.* at 59.

In support of their contention that the Mexican regulations must provide for public access to TTFs, plaintiff's cite the IDCP Art V and Annex IX. Article V requires the "exchange of scientific research data collected by the Parties pursuant to this Agreement on a full and timely basis." Art. V.1.g. This requirement, however, is in the context of the cooperative effort to limit the annual DML to five thousand. There is nothing to indicate this obligation requires countries release TTF's to the general public. In Art. XVII, the Agreement allows public participation, but "subject to procedural rules on access to such information that the Parties may adopt." Art. XVIII goes farther and allows for maintaining confidentiality for information gathered pursuant to the agreement. Annex IX relates to the creation of a tracking and verification system, and requires as part of that system, the "provision of timely access to relevant data." Annex IX.1.g. This system, however, is not an obligation upon countries to disclose to the public, but a system enforced by governments directed toward "vessels subject to its jurisdiction." Annex IX.2.

Contrary to Plaintiff's complaint that Mexican regulations do not specify how TTFs are transmitted to the IATTC, the Mexican regulations do outline a procedure. Section 4.2.16.2 of the Mexican regulations direct observers to submit reports to the "Director of the IATTC if they are observers from that agency, or to the Director of the National Tuna Development and Dolphin Protection Program is they are observers from that program." AR MAF- 4. While greater detail may be desired, it is not necessary, and it is not correct to assert that the Mexican regulations do not provide for any method of reporting.

Similarly, the absence of specific resource allocations in the Mexican regulations does not mean Mexico is failing to implement a tracking system. Mexico is bound by the IDCP to set up such a system, and to provide to the IATTC information produced by their tracking system. If

Mexico fails to fund the system, or the system is insufficient to remain compliant with the IATTC, then Commerce may consider that in subsequent years.  At this point in the implementation process, the Secretary has found sufficient evidence that Mexico is cooperating with the IATTC and complying with its obligations under the IDCP.  This finding is not arbitrary and capricious considered in light of the process to date.

At oral argument Plaintiffs clarified their claim that, "there is no evidence in the record that the Mexican Government has accounted for the 'no encirclement' standard of dolphin-safe tuna pursuant to *Brower v. Daley.*" *Pls.' Br.* at 59.  At issue in *Brower* was the status of the Dolphin-safe label for use in the domestic U.S. market.  The previous standard had used a "no encirclement" test.  Tuna could be sold with the Dolphin-safe symbol only if no dolphins were encircled during the catch.  Under the IDCPA, upon findings by the Secretary of Commerce related to the health of the dolphin stock, the labeling test would change to the international standard of "no dolphins killed or seriously injured."  Thus the meaning of the Dolphin-safe tuna symbol would have changed and its use sanctioned so long as no dolphins had been killed or seriously injured during the catch.[20]  The changing of the dolphin-safe label and the lifting the embargo, though related, run on different tracks.  The changing of the label is an issue of administrative findings based on scientific proof.  The lifting of the embargo on tuna from Mexico is an administrative finding based primarily on Mexico's compliance with the IDCP.  The lifting of the embargo and changing the label each have distinct and separate triggers.  One provision in the Act links to the two standards.  Under 16 U.S.C. § 1371(a)(2)(C)(i)(II),  the

---

[20]As discussed, the Ninth Circuit has affirmed the district court's decision that the statutorily mandated conditions for changing the meaning of the symbol had not been met. *See supra* § II (b).  It is unclear what the results of this decision will be on the international program.

Secretary may not accept documentary evidence from a country seeking an affirmative finding if:

>  (i)the government of the harvesting nation does not provide directly or authorize the Inter-American Tropical Tuna Commission to release complete and accurate information to the Secretary in a timely manner
>
> . . . .
>
>> (II) for the purposes of tracking and verifying compliance with the minimum requirements established by the Secretary in regulations promulgated under subsection (f) of the Dolphin Protection Consumer Information Act.

Mexico has authorized the IATTC to release any information requested by the United States. Under the statute that is all it is required to do.  Plaintiffs may be frustrated that the IATTC reporting requirements correspond to the anticipated requirements of the Dolphin Protection Consumer Information Act, and not the default requirements in light of Commerce's failure to perform the adequate research.  However, under the regulations at issue, Mexico is responsible only for compliance with the IATTC reporting requirements.  Whether the decision in *Bower*, combined with non-corresponding IATTC reports, means that some tuna harvested by the Mexican fleet will be excluded is not an issue the Secretary was required to consider when making his findings with regard to Mexico. Plaintiffs ask this court to find Congress intended to severely restrict the authority of the executive to negotiate international agreements, and to reject the final agreement in this case as contrary to Congressional intent.  *Oral Arg. Tr.* at 39.  This claim raises a host of constitutional and foreign affairs problems, but they do not have to be reached, because this court finds the International Agreement to be consistent with the intent of Congress.  The decision in *Br*ower, interpreting the language of the Dolphin Protection Consumer Information Act does place domestic obligations on Commerce, but it does not alter the International Agreement, or the criteria for lifting an embargo against a country's tuna.

Therefore the Secretary was not arbitrary or capricious when finding that Mexico did not have to account for the decision in *Brower*.

>    5.    Mexican failure to take enforcement actions

Plaintiffs claim Mexico is failing to "consistently take enforcement actions" because the IATTC has reported "repeated and serious" violations by Mexican vessels.  Plaintiffs do not specify how the discovery of violations, which will happen in nearly all enforcement situations, equates to failure to take enforcement actions.  While it is possible violations could become so pervasive that they would indicate non-compliance by Mexico, the IATTC and the US government have not reached that conclusion. In fact, the record indicates numerous actions taken by the Mexican government in response to violations. *See International Dolphin Conservation Program, International Review Panel Annual Report 1997*, Appendix 4.  Further, Commerce indicates it will continue to monitor enforcement of the regulations by the Mexican fisheries authorities.  AF MAF - 50.  This is sufficient to support a conclusion that the Secretary's determination was not arbitrary or capricious.

Plaintiffs also state, "unregulated vessels under 400 tons are illegally setting nets on dolphins." *Pls.' Br.* at 60.  The IDCP and the IDCPA, however, do not govern actions by  vessels under 400 tons. IDCP Annex IV.2.c ("Each Party shall provide...a list of vessels under its jurisdiction of carrying capacity greater than 363 metric tons (400 short tons) that have requested a full -year DML."); 16 U.S.C. § 1385(d)(2)(A) ("[A] tuna product that contains tuna harvested in the eastern tropical Pacific Ocean by a vessel using purse seine nets is dolphin safe if...the vessel is of a type and size that the Secretary has determined, consistent with the International Dolphin Conservation Program, is not capable of deploying its purse seine nets on or to encircle

dolphins.")  Therefore, neither the United States or Mexican government is obliged to monitor or restrict the actions of these smaller vessels, and the Secretary was not acting in an arbitrary and capricious manner or contrary to law in not considering actions by Mexican vessels less than 400 tons.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment on the record is denied and the action is dismissed.  Judgment will be entered accordingly.


Dated: _____          _____
      New York, NY          Judith M. Barzilay
                Judge

ERRATA

*Defenders of Wildlife, et al. v. William T. Hogarth, et al.*, Court No. 00-02-00060, Slip Op. 01-142, Dated December 7, 2001.

On page 1, Before "OPINION" insert:

*Wilmer, Cutler & Pickering (Lynn M. Fischer*) and *The Ocean Conservancy (Jane P. Davenport)*, for Amici Curiae Environmental Defense, Inc., National Wildlife Federation, Inc., The Ocean Conservancy and World Wildlife Fund, Inc.

Page 12, line 5:

Remove space between "fact" and "findings" to make "factfindings" one word.

Page 17, line 22 (last line):

Replace "October 31, 2001" with "October 23, 2001"

Page 13:

Line 11: Replace "[W]e" with "The court"
Line 12: Delete "bv"
Line 14: Delete space between n. and 11, to read "n.11"

Page 38, line 3:

Remove space between "V." and "1.a" to make it Article V.1.a.

Page 58:

Line 8: Add an apostrophe to "*Pls. Br.*" to make it "*Pls.' Br.*"
Line 10: Replace "Art V(1)(h)" with "Art. V.1.h."
Line 16: Replace "Art VII" with "Art. VII"

Page 59,

Line 4: Replace "Art V(1)" with "Art. V.1."
Line 20: Replace "Art V.1.c." with "Art. V.1.c."


February 1, 2002